STATE OF CONNECTICUT *v.* ANTHONY CAIN
(1¹407)

PETERS, C. J., CALLAHAN, GLASS, BORDEN and BERDON, Js.

Argued June 4—decision released August 25, 1992

*Richard Emanuel,* assistant public defender, with whom, on the brief, were *G. Douglas Nash,* public defender, and *Suzanne Zitser* and *Kent Drager,* assistant public defenders, for the appellant (defendant).

*Harry Weller,* assistant state's attorney, with whom, on the brief, were *Mary Galvin,* state's attorney, and *Frank McQuade,* supervisory assistant state's attorney, for the appellee (state).

*Max S. Case* filed a brief for the city of Milford as amicus curiae.

BORDEN, J. The dispositive issue of this appeal is whether a 911 emergency telephone call is a "statement" within the meaning of Practice Book § 749 (2).[1] The defendant, Anthony Cain, appeals, upon our grant of certification, from the judgment of the Appellate Court affirming the trial court's judgment of conviction, after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70,[2] and burglary in the third degree in violation of General Statutes § 53a-103.[3] The defendant claims that the judgment of the Appellate Court should be reversed because the unavailability of the tape recording of the victim's 911 telephone call and the failure of the trial court to strike the testimony of the victim in light of that unavailability violated the defendant's rights under

---

[1] Practice Book § 749 provides: "The term 'statement' as used in Sec. 748 means: (1) A written statement made by a person and signed or otherwise adopted or approved by him; or (2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement."

[2] General Statutes § 53a-70 provides: "SEXUAL ASSAULT IN THE FIRST DEGREE: CLASS B FELONY: ONE YEAR NOT SUSPENDABLE. (a) A person is guilty of sexual assault in the first degree when such person (1) compels another person to engage in sexual intercourse by the use of force against such other person or a third person, or by the threat of use of force against such other person or against a third person which reasonably causes such person to fear physical injury to such person or a third person, or (2) engages in sexual intercourse with a person under thirteen years of age.

"(b) Sexual assault in the first degree is a class B felony for which one year of the sentence imposed may not be suspended or reduced by the court."

[3] General Statutes § 53a-103 provides: "BURGLARY IN THE THIRD DEGREE: CLASS D FELONY. (a) A person is guilty of burglary in the third degree when he enters or remains unlawfully in a building with intent to commit a crime therein.

"(b) Burglary in the third degree is a class D felony."

The defendant was also convicted of harassment in the second degree in violation of General Statutes § 53a-183 (a) (3). That conviction, which was also affirmed by the Appellate Court, is not implicated by the issues certified in this appeal, however, and, therefore, is not before us.

Practice Book § 752,[4] General Statutes § 54-86b,[5] and his federal and state constitutional rights of confrontation.[6] We hold that a tape recording of a 911 emergency telephone call is not a "statement" within the meaning of either Practice Book § 749 or General Statutes § 54-86b, and that, therefore, the state was not required by the provisions of the Practice Book to preserve and produce the tape recording in question. Accordingly, we affirm the judgment of the Appellate Court.

The relevant facts were stated by the Appellate Court: "From 1985 until December, 1987, the defendant and the victim were romantically involved. In December, 1987, the victim severed her relationship with the defendant. After their breakup, the defend-

---

[4] Practice Book § 752 provides: "After a witness called by the state has testified on direct examination at trial, the judicial authority shall, on motion of the defendant, order the state to produce any statement of the witness in the possession of the state or its agents, including state and local law enforcement officers, which statement relates to the subject matter about which the witness has testified."

[5] General Statutes § 54-86b provides: "RIGHT OF ACCUSED TO EXAMINE STATEMENTS. (a) In any criminal prosecution, after a witness called by the prosecution has testified on direct examination, the court shall on motion of the defendant order the prosecution to produce any statement oral or written of the witness in the possession of the prosecution which relates to the subject matter as to which the witness has testified, and the court shall order said statement to be delivered directly to the defendant for his examination and use.

"(b) If the prosecution fails to comply with the order of the court, the court shall strike from the record the testimony of the witness and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared."

[6] The defendant's arguments in support of his claims of constitutional violations are premised on the antecedent claim that the tape recording in question was a discoverable statement of a witness for the state pursuant to Practice Book § 752, and that the Appellate Court employed an improper harmless error analysis to that violation of his discovery rights. Indeed, that issue was the basis of our third certified question. See footnote 7, infra. Since we reject that antecedent claim and conclude that the tape recording in question was not a discoverable statement under our rules of practice, we need not address the defendant's constitutional claims.

ant began repeatedly calling the victim at home and at work. On January 23, 1988, the defendant telephoned the victim and threatened her, stating that she would be sorry if she did not get back together with him. The victim filed a complaint with the Milford police department, but did not seek the defendant's arrest at that time.

"On February 14, 1988, the defendant telephoned the victim at her apartment and asked her to go to lunch with him. She refused his invitation and turned on her answering machine to avoid further calls from him. After the victim showered and got dressed, she noticed that her cat was standing by the door. She opened the door and the defendant forced his way into her apartment, forced her onto the sofa, and sexually assaulted her. The victim then retreated to the bathroom and locked the bathroom door behind her. She stayed in this room until the defendant left the apartment.

"After the defendant left her apartment, the victim called a friend, who advised the victim to call 911. The victim then dialed 911 and reported that she had been sexually assaulted and named the defendant as her assailant. The defendant was arrested and charged with first degree sexual assault and burglary in the third degree, and was released on bond." *State* v. *Cain*, 25 Conn. App. 503, 505–506, 596 A.2d 449 (1991).

On appeal to the Appellate Court, the defendant claimed that the trial court improperly denied his motion to strike the testimony of the victim, because of the state's failure to produce the tape of her 911 telephone call. Id., 507. The Appellate Court stated the following facts that were necessary for the resolution of that claim: "At trial, the victim testified that when she called her friend after the defendant had left the apartment, she told her, 'Tony assaulted me.' The victim also testified that when she dialed 911 to report

the incident, she told the police that the defendant had raped her. When the victim's friend testified, she stated that when the victim telephoned her immediately after the incident she said, 'Tony hit me.'

"Before the trial began, the trial court granted the defendant's motion for discovery seeking '[c]opies of statements of prosecution witnesses in the possession of the State or its agents, including state and local law enforcement officers, which statements relate to the subject matter about which the witness will testify . . . .' Although the 911 call was tape-recorded when it was made, this tape was erased thirty days after the incident pursuant to Milford police department policy. Consequently, the state was unable to produce the tape at the time of trial. The defendant contends that the destruction of the 911 tape and the state's inability to produce it violated his rights under General Statutes § 54-86b and Practice Book § 752. He also alleges that the 911 tape could have explained the discrepancy between the victim's testimony and that of her friend, and that its nonproduction violated his right to confrontation as guaranteed under the state and federal constitutions." Id., 508–509

The Appellate Court held, in accordance with an acknowledgment by the state, that the tape recording of the 911 call was a "statement" within the meaning of Practice Book § 749 (2). Id., 509. It also held that, since the erasure of the tape had not been done in bad faith; see *State* v. *Williamson,* 212 Conn. 6, 16, 562 A.2d 470 (1989) (in context of violation of Practice Book § 752, "bad faith" means done with intent to deprive defendant of information); the defendant's constitutional right of confrontation had not been violated, and that the violation of Practice Book § 752 was harmless. *State* v. *Cain,* supra, 510–11.

The Appellate Court also held, however, that "because . . . the indefinite preservation of 911 tapes can place an unreasonable burden on police departments"; id., 512; henceforth, 911 tapes "are excluded from that portion of Practice Book § 752 that states that a defendant may refrain from moving for production of statements until after a state's witness has testified." Id. The court mandated that police departments preserve all 911 tapes for one year "from the date of the 911 call." Id. If within that period a defendant had not requested the preservation of a 911 recording, the police department would be free to erase and reuse the tape; if the defendant had requested the tape's preservation, erasure of the tape would be a per se violation of Practice Book § 751 et seq. and General Statutes § 54-86b requiring the trial court to strike the testimony of the witness who had made the 911 call. Id., 513. Recognizing, however, that in some cases there may not have been an arrest within a reasonable time after the 911 call, the court held that if "the police investigation [were] protracted . . . the police shall bear the burden of preserving the tape for one year from the date of arrest." Id., 513–14.

We granted the defendant's petition for certification, as supplemented by the state's response thereto.[7] This appeal followed.

With respect to the first certified question; see footnote 7; the defendant argues that, first, under the plain language of Practice Book § 749 (2), a tape

[7] We certified the following questions: "1. Do Practice Book sections 748 through 755 require a municipality to preserve and produce 911 tapes?

"2. Did the Appellate Court properly establish a one year retention period for such tapes?

"3. Did the Appellate Court apply the proper harmless error standard to the destruction of the 911 tape in this case?

"4. What was the effect of the defendant's failure promptly to seek preservation of the 911 tape in this case?" State v. Cain, 220 Conn. 931, 599 A.2d 383 (1991).

recording of a 911 telephone call is a "statement,"[8] that second, such tapes are in the possession of the state or its agents, including not only police departments but all municipalities, and third, it is foreseeable that such tapes might be relevant to criminal prosecutions. Therefore, the defendant contends that such tapes must be preserved by the state and produced upon request of the defendant pursuant to Practice Book § 752. We disagree.[9] We conclude, to the contrary, that despite the

[8] Although our granting of certification referred only to the provisions of the Practice Book, and did not refer to the provisions of General Statutes § 54-86b; see footnote 7, supra; the defendant also relies on the provisions of the statute. Unlike Practice Book § 749 (2), which explicitly defines the term "statement"; see footnote 1, supra; the statute merely refers to "any statement oral or written of the witness in the possession of the prosecution . . . ." Thus, the defendant's argument pursuant to the Practice Book is stronger than his statutory argument, both because of the lack of a specific definition of the term "statement" in the statute and because of its requirement that the "statement . . . [be] in the possession of the *prosecution,*" (emphasis added) rather than, as under Practice Book § 752, "in the possession of the state or its agents, including any state and local law enforcement officers . . . ." Our conclusion that the term "statement" in § 749 (2) does not include a tape of a 911 call, therefore, a fortiori applies to the use of the term "statement" in General Statutes § 54-86b.

This conclusion is buttressed by reference to the only legislative history applicable to § 54-86b. That history makes no reference to anything resembling a 911 tape, and refers only to "written statements and oral statements which have come into the possession of the prosecution," and to the notion that "the defendant should have equal access *to these statements that are in the files of the prosecution.*" (Emphasis added.) 13 S. Proc., Pt. 7, 1969 Sess., pp. 3145–46, remarks of Senator John F. Pickett. While not conclusive, the language and legislative history of § 54-86b is consistent with our conclusion, under Practice Book § 749 (2), that the term "statement" as used therein does not include a tape of a 911 telephone call.

[9] We acknowledge, as the defendant points out, that until now our cases have treated a tape recording of a 911 call as a "statement" under Practice Book § 749 (2), either by virtue of a specific concession to that effect by the state; see, e.g., *State* v. *Myers,* 193 Conn. 457, 466, 479 A.2d 199 (1984); or by virtue of assuming so without deciding. See, e.g., *State* v. *Williamson,* 212 Conn. 6, 12, 562 A.2d 470 (1989). Despite this history, however, we have never explicitly considered whether that treatment was correct. In *Williamson,* we certified the question, "whether tape recorded 911 emergency telephone calls must be preserved on the chance that they might be discoverable under Practice Book § 752." Id., 9. We did not reach

fact that the language of Practice Book § 749 (2), read literally, would cover the tape recording of a 911 telephone call, it is not within the intent of that language to cover such a tape recording and that, therefore, a tape recording of a 911 telephone call is not a "statement" within the meaning of § 749 (2) that is subject to preservation and to disclosure pursuant to § 752.[10]

We begin with a history and description of the 911 emergency telephone call system in our state.[11] In 1968, the American Telephone and Telegraph Company (AT&T) designated 911 as a nationwide, universal emergency telephone number. Statewide Emergency Communications Study Commission Final Report to the Connecticut General Assembly (1980). After a series of public acts regarding the study and implementation of such a system statewide; see Spec. Acts 1978, No.

that issue, however, because we held that the nonproduction of a tape recording of an interview with a state's witness required reversal of the conviction. Id.

Significantly, we have found no case of an appellate court in this nation that has explicitly held that a tape recording of a 911 emergency telephone call is a statement of a witness that must be preserved and disclosed to the defendant pursuant to rules of practice similar to Practice Book § 749 (2). The jurisdictions that come closest are the District of Columbia, whose Court of Appeals has explicitly assumed without deciding that to be the case; see *Slye* v. *United States,* 602 A.2d 135, 138 n.6 (D.C. 1992); *Bartley* v. *United States,* 530 A.2d 692, 697 n.10 (D.C. 1987); and New York, whose Appellate Division of the Supreme Court proceeded on the basis of the concession of the state. *People* v. *Parker,* 157 App. Div. 2d 519, 549 N.Y.S.2d 710 (1990); see also *State* v. *Conway,* 740 S.W.2d 320 (Mo. App. 1987) (failure to preserve 911 tape not due process violation); *Seattle* v. *Duncan,* 44 Wash. App. 735, 723 P.2d 1156 (1986) (prosecution conceded it had duty to preserve 911 tape pursuant to state precedent, but error held harmless).

[10] This conclusion renders it unnecessary to consider the remaining certified questions in this case.

[11] As explained in the text, infra, Connecticut municipalities operate an "enhanced 9-1-1" system. This is a system that automatically identifies on a screen the telephone number and geographical location from which the call was made. General Statutes § 28-25 (5). We use the term "911" to refer to this system.

35; Spec. Acts 1979, No. 56; Public Acts 1980, No. 80-360; and Public Acts 1981, No. 81-458; in 1984, the legislature enacted what are now General Statutes §§ 28-25 through 28-29b,[12] requiring, inter alia, that "[e]ach municipality shall, not later than December 31, 1989, establish and operate a public safety answering point which utilizes enhanced 9-1-1 network features." General Statutes § 28-25a (b). Pursuant to these statutes, each municipality maintains, on a twenty-four hour basis, a "public safety answering point." A " '[p]ublic safety answering point' means a facility, operated on a twenty-four hour basis, assigned the responsibility of receiving 9-1-1 calls and, as appropriate, directly dispatching emergency response services, or transferring or relaying emergency 9-1-1 calls to other public safety agencies. A public safety answering point is the first point of reception by a public safety agency of a 9-1-1 call and serves the jurisdictions in which it is located or other participating jurisdictions." General Statutes § 28-25 (10). A " '[p]ublic safety agency' means a functional division of a municipality or the state which provides fire fighting, law enforcement, ambulance, medical or other emergency services." General Statutes § 28-25 (8). Thus, 911 telephone calls consist not only of calls to report crimes, but consist of calls for all emergencies, including fire, ambulance, medical, and any other needed emergency service. Furthermore, such calls are routed, in the first instance, to the "public safety answering point" designated by that municipality, which may or may not be the local police department.

Since the 911 system identifies only the telephone number and geographical location of the source of the incoming call, but not necessarily the location and nature of the need for service, that information can only

---

[12] These statutes are located at chapter 518a of the General Statutes, entitled "Emergency Telecommunications."

be preserved by writing it down or tape-recording it. Tape-recording is the fastest and most accurate method of logging such calls, and permits the monitor of the call to concentrate on the needs of the caller rather than on writing down the message. The automatic tape-recording of 911 calls also provides a quick and accurate method of retrieving the call in the event of confusion. United States Department of Justice, Bureau of Justice Statistics, The Design and Casting of 911 Systems, A Technical Manual, p. 53. Implicit in this legislative scheme for a telephonic emergency response system is the need for speed and accuracy in the interest of public safety.

Since tape recordings of 911 calls are public records, they are subject to the regulations regarding preservation and disposition of such records promulgated by the public records administrator pursuant to General Statutes § 11-8.[13] Administrative and financial burdens

---

[13] The public records administrator is appointed by the state librarian to carry out the duties of the librarian pursuant to General Statutes §§ 11-8 through 11-8c.

General Statutes § 11-8 provides: "RECORDS MANAGEMENT PROGRAM. PUBLIC RECORDS ADMINISTRATOR. (a) Under the direction of the state library board, the state librarian shall be responsible for developing and directing a records management program for the books, records, papers and documents of all state agencies within the executive department, and the books, records, papers and documents of the several towns, cities, boroughs, districts and other political subdivisions of the state, including the probate districts, pursuant to the provisions of section 11-8a. The state librarian shall also supervise the operation of state records centers; provide photoduplication and microfilming service and document repair and restoration service for state and local records; approve security storage facilities, within or without the state, or establish and operate such facilities within the state, for the safe storage of original public records or security copies thereof; and carry out a program for the identification and preservation of essential records of the state and of its political subdivisions. He shall, with the approval of the state library board, and in accordance with the provisions of chapter 54, adopt regulations for the creation and preservation of the records of the several towns, cities, boroughs and districts, including probate districts, of the state. Such regulations shall establish the physical characteristics required for papers, inks, typewriter ribbons, car-

play a role in the determination of how long such records must be preserved. Therefore, the public records administrator, acting pursuant to the state librarian's authority, is required, in carrying out his duties under § 11-8, to "consult with the attorney general, the probate court administrator and the chief executive officers of the Connecticut Town Clerks Association and the Municipal Finance Officers Association of Connecticut, or their duly appointed representatives." General Statutes § 11-8a. Under current retention schedules, promulgated by the public records administrator, tape recordings of 911 calls must be preserved for thirty days, unless within that period of time a notice of intent to file a claim against a municipality or its employee has been filed with the municipality pursuant to General Statutes § 7-101a (d).[14] Public Records Adminis-

bon papers, loose-leaf binders, photographic films or other supplies and materials, including photographic or other processes for recording documents, used in the creation of public records; and the design, construction and degree of fire resistance required for safes, cabinets, vaults and file rooms in which public records are housed. He shall ascertain from time to time whether the provisions of the general statutes and of such regulations relating to the recording, filing, indexing, maintenance and disposition of such records are being carried out. He may order any person having the care and custody of such records to comply with such statutes or with such regulations. He shall send a copy of such order to the chief administrative officer of the town, city, borough or district to which the records relate. The order shall specify the time within which it shall be complied with; and, in setting such time, he shall take into consideration the availability of facilities or equipment or the need for the construction or purchase thereof. The state librarian may cause the enforcement of any such order by application to the superior court, or to any judge thereof if said court is not then sitting, to issue an appropriate decree or process, which application shall be brought and the proceedings thereon conducted by the attorney general.

"(b) The state librarian shall, subject to the provisions of chapter 67, appoint an assistant who shall be the public records administrator. All powers, functions and duties assigned to the examiner of public records are hereby transferred to the public records administrator."

[14] General Statutes § 7-101a provides: "PROTECTION OF MUNICIPAL OFFICERS AND MUNICIPAL EMPLOYEES FROM DAMAGE SUITS. REIMBURSEMENT OF DEFENSE EXPENSES. LIABILITY INSURANCE. TIME LIMIT FOR FILING NOTICE AND COMMENCEMENT OF ACTION. (a) Each municipality shall pro-

tration, Records Retention/Disposition Schedules, Municipalities/Towns, p. 23. Thus, a municipality may ordinarily erase and reuse the tape after thirty days. It is significant that this thirty day period, arrived at after the appropriate consultations pursuant to § 11-8a, is five months less than the six month notice of claim period provided under § 7-101a (d). The responsible public officials could have mandated that 911 tapes be pre-

tect and save harmless any municipal officer, whether elected or appointed, of any board, committee, council, agency or commission, including any member of a local emergency planning committee appointed from such municipality pursuant to section 22a-601, or any municipal employee, of such municipality from financial loss and expense, including legal fees and costs, if any, arising out of any claim, demand, suit or judgment by reason of alleged negligence, or for alleged infringement of any person's civil rights, on the part of such officer or such employee while acting in the discharge of his duties.

"(b) In addition to the protection provided under subsection (a) of this section, each municipality shall protect and save harmless any such municipal officer or municipal employee from financial loss and expense, including legal fees and costs, if any, arising out of any claim, demand or suit instituted against such officer or employee by reason of alleged malicious, wanton or wilful act or ultra vires act, on the part of such officer or employee while acting in the discharge of his duties. In the event such officer or employee has a judgment entered against him for a malicious, wanton or wilful act in a court of law, such municipality shall be reimbursed by such officer or employee for expenses it incurred in providing such defense and shall not be held liable to such officer and employee for any financial loss or expense resulting from such act.

"(c) Each such municipality may insure against the liability imposed by this section in any insurance company organized in this state or in any insurance company of another state authorized to write such insurance in this state or may elect to act as self-insurer of such liability.

"(d) No action shall be maintained under this section against such municipality or employee unless such action is commenced within two years after the cause of action therefor arose nor unless written notice of the intention to commence such action and of the time when and the place where the damages were incurred or sustained has been filed with the clerk of such municipality within six months after such cause of action has accrued.

"(e) For the purposes of this section 'municipality' means any town, city, borough, consolidated town and city, consolidated town and borough, district, district department of health, or authority established by the general statutes, a special act or local law, ordinance or charter or any public agency."

served for six months to coincide with § 7-101a. Instead, it is apparent that they weighed the financial and administrative burdens of retaining tapes against the risks of liability under § 7-101a.

With this background in mind, we turn to the defendant's contention that the language of Practice Book § 749 (2) is clear and unambiguous and thus requires the conclusion that a tape recording of a 911 call is a "statement" within the meaning of that language. The rules of statutory interpretation apply to provisions of the Practice Book. *State* v. *Genotti*, 220 Conn. 796, 807, 601 A.2d 1013 (1992). If a statute is clear and unambiguous, there is no room for statutory construction. *Mercado* v. *Commissioner of Income Maintenance*, 222 Conn. 69, 74, 607 A.2d 1142 (1992). The rule that unambiguous language requires only strict application to the facts and prohibits resort to other aids to interpretation only applies, however, where the language is *absolutely* clear and unambiguous; *Elections Review Committee of the Eighth Utilities District* v. *Freedom of Information Commission*, 219 Conn. 685, 692, 595 A.2d 313 (1991); and where no inherent ambiguity is disclosed by reference to the facts of the case. Furthermore, even if a statute is considered clear on its face, if a literal interpretation of that statute would lead to unworkable results, resort to other aids to determine legislative intent is appropriate. See, e.g., *Fairfield Plumbing & Heating Supply Corporation* v. *Kosa*, 220 Conn. 643, 650–51, 600 A.2d 1 (1991).[15] As applied to

[15] While the dissent may be "bewildered" by these so-called "new" rules of statutory construction, each rule is a well established tenet of statutory construction. See *Rose* v. *Freedom of Information Commission*, 221 Conn. 217, 602 A.2d 1019 (1992) (where statutory language not *absolutely* clear, reference may be made to legislative history to determine purpose); *Anderson* v. *Ludgin*, 175 Conn. 545, 400 A.2d 712 (1978) (same); *State* v. *Guckian*, 27 Conn. App. 225, 605 A.2d 874 (1992) (same); *Augeri* v. *Planning & Zoning Commission*, 24 Conn. App. 172, 586 A.2d 635, cert. denied, 218 Conn. 904, 588 A.2d 1383 (1991) (same); *Shelby Mutual Ins. Co.* v. *Della*

the facts of this case, we do not regard the language of § 749 (2) to be so absolutely clear that further interpretation is unnecessary. Moreover, even if we were to conclude that the language of § 749 (2) is clear, a literal interpretation of that section would lead to an unworkable result, which we seek to avoid.

Practice Book §§ 748 through 755 establish, inter alia, a scheme for the discovery and use by the defendant of statements of witnesses for the state. Insofar as it relates to this case, this scheme hinges on the definition of "statement" in § 749 (2): "A . . . mechanical, electrical, or other recording . . . which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement." Pursuant to § 752, after the direct testimony of a state's witness the trial court "shall, on the motion of the defendant, order the state to produce any [such] statement of the witness in the possession of the state or its agents, including state and local law enforcement officers, which statement relates to the subject matter about which the witness has testified." In order for the state to comply with § 752, the state and its agents, including state and local law enforcement agencies, must, therefore, preserve § 749 (2) "statements" for subsequent disclosure upon

_____

*Ghelfa,* 3 Conn. App. 432, 489 A.2d 398 (1985), aff'd, 200 Conn. 630, 513 A.2d 52 (1986) (same); see also *Federal Aviation Administration* v. *Administrator,* 196 Conn. 546, 553, 494 A.2d 564 (1985) (*Healey, J.,* dissenting) (where plain meaning of statute produces absurd or futile results, court may look to purpose of statute to determine legislative intent); *Simonette* v. *Great American Ins. Co.,* 165 Conn. 466, 474, 338 A.2d 453 (1973) (*Bogdanski, J.,* dissenting) (same with respect to anomalous result that is at variance with legislative intent); *United States* v. *American Trucking Assns.,* 310 U.S. 534, 543, 60 S. Ct. 1059, 84 L. Ed. 1345 (1940) (same); *Benoni* v. *Boston & Maine Corporation,* 828 F.2d 52, 58 (1st Cir. 1987) (even if statute "plain and unambiguous," should not apply literal meaning if such an application would lead to absurd result or thwart purpose of statute); *Heppner* v. *Alyeska Pipeline Service Co.,* 665 F.2d 868 (9th Cir. 1981) (same); 2A J. Sutherland, Statutory Construction (4th Ed. Sands) § 46.07.

request by the defendant. Indeed, we have so held. *State* v. *Myers,* 193 Conn. 457, 466, 479 A.2d 199 (1984).

Pursuant to these Practice Book sections, whenever the state or its agents tape-records the words of an individual and that individual subsequently testifies for the state in a criminal trial regarding the subject matter of his tape-recorded words, that tape recording must have been preserved for production to the defendant in that trial pursuant to a request under § 752. Thus, if a tape recording is deemed to be a "statement" within the meaning of § 749 (2), the state or its agents must preserve that tape recording, or a copy thereof, until its production is requested in a criminal trial some time in the future. This means, therefore, that some such tape recordings must be preserved almost indefinitely, since there will be some cases in which the trial may not take place until many years after the tape recording in question was made, either because no arrest was made until years later, or because the defendant had absconded, or for other valid reasons. It also means that whenever the state or any of its agencies, which under the defendant's reading of §§ 749 and 752 includes all municipalities, tape-records an individual's words, that tape recording must be preserved on the chance that it will be required to be produced at some time in the future pursuant to a request under § 752.

Application of this analysis to the tape-recording of 911 telephone calls leads us to conclude at a minimum that, despite the seemingly clear language of § 749 (2), it is not absolutely clear that the definition of "statement" was intended to include such a tape recording. Furthermore, even if we were to regard § 749 (2) as clear, a literal interpretation of that section would lead to an unworkable result. Such a conclusion would mean, as a practical matter, that each municipality would be required by the provisions of the Practice Book to preserve indefinitely tapes of all 911 emergency telephone

calls, because it would be impossible for the municipality to determine at the instant of each such call whether it would be required to produce the tape recording at some time in the future. Moreover, since all 911 calls come into one initial public safety answering point and include, not only requests for police services, but calls for fire, ambulance, medical and all other emergency services, and since conceivably any of those calls might be relevant to some subsequent criminal trial, all of those tapes would have to be preserved indefinitely as well.

The extent of the administrative and financial burdens that this process would impose cannot be gainsaid.[16] It would defeat the principal purpose of automatically tape-recording 911 calls, namely, speed and accuracy in the interest of public safety, to require the monitor of such calls to record the nature of each call for future potential use under Practice Book § 752. Therefore, as a practical matter all tapes of 911 calls would have to be preserved. As the amicus, the city of Milford, points out, these are, under the current state of the technology, twenty-four hour tapes, one for each day. Thus, every municipality would be required to pur-

---

[16] The amicus, the city of Milford, points out that in Milford a 911 telephone call is received at two points—the public safety answering point and the department or service to which the call is transmitted. Each point has its own recording system. Thus, each tape would have to be preserved.

The amicus also represents to us that, even under the Appellate Court's proposed one year retention schedule, the additional annual cost to the city of Milford of purchasing the required twenty-four hour tapes for each day of the year, rather than erasing and reusing them every thirty days under the public records administrator's schedule, would be $35,499.75. This does not include, moreover, the additional costs for making copies of the tapes when requested if the case comes to trial, for the additional labor required to catalog, inventory, store, maintain and transfer the tapes to the proper party upon request, or for the construction or purchase of adequately dry and ventilated storage facilities in order to prevent the deterioration of the tapes. Nor does this estimate include, of course, the additional cost if such tapes were required to be preserved indefinitely, rather than merely for the one year period established by the Appellate Court.

chase and preserve indefinitely an ever expanding inventory of twenty-four hour tapes, as well as provide for their adequate storage, security, cataloging, inventorying, retrieval and transfer upon later request.

That this would be the result of the strict application of purportedly "unambiguous" language, despite the obvious administrative and financial burdens imposed thereby, counsels strongly that we look further into its intended meaning. Indeed, the defendant's suggested limitation on § 749 (2), that it applies only to tape recordings that might *foreseeably* be relevant to a subsequent criminal prosecution, is itself an implicit acknowledgment that the language of § 749 (2) cannot be taken literally in all cases, since no such limitation appears in that literal language. As applied to tape recordings of 911 telephone calls, therefore, § 749 (2) is inherently ambiguous. See *In re Jessica M.*, 217 Conn. 459, 467–68, 586 A.2d 597 (1991) (General Statutes [Rev. to 1989] § 45-61f [f] [3] inherently ambiguous when applied to noncustodial parents who must maintain relationship with children through visitation).

We turn, therefore, to an analysis of the history and purpose of § 749 (2) in order to determine whether that section was intended to apply to 911 tape recordings. See *Lauer* v. *Zoning Commission*, 220 Conn. 455, 460, 600 A.2d 310 (1991) (legislative history and legislative policy are relevant aids in determining legislative intent). That analysis convinces us that § 749 (2) was not intended to encompass tape recordings of 911 emergency telephone calls.

Until 1976, our rules of practice contained few provisions governing procedure in criminal cases. Responding to the need for a comprehensive set of such rules, the judicial branch established an Advisory Committee to Revise the Criminal Rules, consisting of representatives of the prosecution, defense and judiciary.

L. Orland, Connecticut Criminal Practice (1983) pp. vi–xii. The product of that committee, which included what are now Practice Book §§ 748 through 755, was adopted by the judges of the Superior Court effective October 1, 1976.

The definition of "statement" contained in Practice Book § 749 was taken from the federal Jencks Act, 18 U.S.C. § 3500.[17] L. Orland, supra, § 749, p. 203. The Jencks Act, enacted in 1957, was the prompt congressional response to the decision in *Jencks* v. *United States,* 353 U.S. 657, 77 S. Ct. 1007, 1 L. Ed. 2d 1103 (1957). In *Jencks,* the United States Supreme Court, "[e]xercising [its] power, in the absence of statutory provision, to prescribe procedures for the administration of justice in the federal courts . . . [had] decided that the defense in a federal criminal prosecution was entitled, under certain circumstances, to obtain, for impeachment purposes, statements which had been made to government agents by government witnesses." *Palermo* v. *United States,* 360 U.S. 343, 345, 79 S. Ct. 1217, 3 L. Ed. 2d 1287 (1959).

One of the principal purposes of the federal Jencks Act was to guard against the risk that "[d]istortion can be a product of selectivity as well as the conscious or inadvertent infusion of the recorder's opinions or impressions. It is clear from the continuous congressional emphasis on 'substantially verbatim recital,' and 'continuous, narrative statements, made by the witness

---

[17] Title 18 of the United States Code, § 3500 (e) defines a "statement," for purposes of the Jencks Act, as follows: "The term 'statement,' as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—(1) a written statement made by said witness and signed or otherwise adopted or approved by him; (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury."

recorded verbatim, or nearly so' . . . that the legislation was designed to eliminate the danger of distortion and misrepresentation inherent in a report which merely selects portions, albeit accurately, from a lengthy oral recital. Quoting out of context is one of the most frequent and powerful modes of misquotation." Id., 352.

Aside from this general reference to certain of the inferences to be drawn from the legislative history regarding the scope and purpose of the Jencks Act, we have not discovered any similar discussion regarding the scope and purpose of that part of the definition of "statement" with which this case is concerned, namely, the simultaneous recording of an oral statement of a witness. Senate Report No. 981, which accompanied Senate Bill No. 2377, the Senate version of the proposed legislation, stated that "it is the specific intent of the bill to provide for the production only of written statements previously made by a Government witness in the possession of the United States which are signed by him or otherwise adopted or approved by him, and any transcriptions or recordings of oral statements made by the witness to a Federal law officer . . . ." S. Rep. No. 981, 85th Cong., 1st Sess., reprinted in 1957 U.S. Code Cong. & Ad. News 1862. The House of Representatives version, House Bill No. 7915, did not specifically include tape-recorded statements. It referred only to "such reports or statements of the witness in the possession of the United States *as are signed by the witness, or otherwise adopted or approved by him as correct* . . . ." (Emphasis in original.) H.R. Rep. No. 700, 85th Cong., 1st Sess. (1957), reprinted in III House Miscellaneous Reports on Public Bills 5. Commenting on the difference between the two versions, the joint Senate and House conference report simply stated that "[t]o remove any doubt as to the kinds of statements affected by the bill as agreed to by the con-

ferees, a new paragraph 'e' was added to the proposed section 3500 of title 18 of the United States Code expressly defining the term 'statement.' " Conf. Rep. No. 1271, 85th Cong., 1st Sess., reprinted in 1957 U.S. Code Cong. & Ad. News 1870.

We draw several conclusions from this history. First, since the source of Practice Book § 749 (2) is the rule-making authority of the judges of the Superior Court governing the practice and procedure of criminal trials, it is unlikely that they intended that definition of "statement" to include tape recordings of 911 emergency telephone calls. Although in some instances a violation of Practice Book § 752 might give rise to a violation of the defendant's constitutional right of confrontation; *State* v. *Johnson,* 214 Conn. 161, 173, 571 A.2d 79 (1990); Practice Book §§ 748 through 755 were promulgated pursuant to that rule-making authority, rather than pursuant to the command of either the federal or state constitution.

Earlier in this opinion, in the context of determining that the language of § 749 (2) is inherently ambiguous as applied to tape recordings of 911 calls, we outlined the severe administrative and financial burdens that would flow from such an application. See footnote 16, supra, and accompanying text. In the same context, we also discussed the state's legislative and administrative response to the problem of preserving and maintaining such tapes for lengthy periods of time, namely, that under current schedules promulgated by the public records administrator pursuant to General Statutes § 11-8, municipalities ordinarily need only preserve such tapes for thirty days. The same considerations apply in determining whether § 749 (2) was intended by the judges of the Superior Court to apply to tape recordings of 911 calls.

Since such an application would involve severe financial and administrative burdens on municipalities, we should be cautious about reading judicial language that is employed in the rule-making capacity of the judges so as to impose those burdens. Although the exercise of the judicial rule-making authority will often result in some administrative and financial cost to the parties to litigation, it does not ordinarily involve the imposition of severe burdens on the political entities of our state that, in and of themselves, are not parties to that litigation. Furthermore, there is no indication that, in exercising their authority, either the advisory committee or the rules committee of the judges heard from the public entities that would be most affected by application of § 749 (2) to tape recordings of 911 calls, namely, the 169 municipalities of this state. It is unlikely that the promulgators of § 749 (2) considered it to be within their competence and purview, without inquiring into the inherent administrative and financial costs thereof, to make substantive judgments about the advisability of indefinitely preserving all tape recordings of all telephone calls for the entire range of such emergency services. This is particularly true where to do so would involve such serious burdens on the municipalities maintaining that telephonic system.

Thus, when we are asked to read ambiguous rule-making language so as to yield such an unworkable result, we should require a clear indication of judicial intent to do so. There is no such indication in the language or history of § 749 (2). It is highly unlikely, therefore, that § 749 (2) was ever intended to encompass tape recordings of 911 calls, as those calls are made and received pursuant to our statewide, legislatively mandated 911 system.

Second, the definition contained in § 749 (2) derives directly from the Jencks Act. The thrust of the definition of "statement" under that act was to guard against

the risk of quotation out of context from a "lengthy oral recital." *Palermo* v. *United States,* supra. To the extent that the federal definition, as it emerged from the congressional conference, adopted and refined the Senate's version, which referred to tape-recorded as well as written statements, there is no indication that it was intended to encompass the kind of short, speedy call for emergency assistance that ordinarily characterizes a 911 emergency telephone call.[18]

Finally, § 749 (2) was adopted by the judges in 1976 and was, at that time, taken directly from the Jencks Act definition adopted by the Congress in 1957. The 911 designation for emergency telephone calls was not designated by AT&T until 1968, however, and the telephonic system currently in place was not legislatively mandated until 1984 and not implemented, in accordance with that mandate, until 1989. This time sequence further convinces us that, when, in 1976, the advisory committee drafted and the judges adopted the language of § 749 (2), they did not contemplate that it would be applied in 1992 to a complex telephonic system that did not exist in 1976 and that, by legislative mandate, inextricably links, not only local law enforcement agencies, but fire, ambulance, medical and other emergency services as well.

The conclusion that § 749 (2) does not include a tape recording of a 911 emergency telephone call does not mean, as the defendant suggests, that the rights of defendants to fair trials will be severely impaired. In the eight years beginning with *State* v. *Myers,* 193 Conn. 457, 479 A.2d 199 (1984), when we first consid-

---

[18] We do not suggest that Practice Book § 749 (2) only applies to *lengthy* recorded statements of witnesses. Certainly, if a tape recording qualifies as a "statement" under § 749 (2), its brevity will not disqualify it. We emphasize this statement from *Palermo* v. *United States,* 360 U.S. 343, 79 S. Ct. 1217, 3 L. Ed. 2d 1287 (1959), only to highlight the fact that it is unlikely that the Jencks Act contemplates a tape recording of a 911 call.

ered the effect of an erased 911 tape recording, pursuant to the state's concession in that case that the tape recording was a § 749 (2) "statement," neither this court nor the Appellate Court has found the erasure of any such tape recording to have been harmful to the defendant.[19] See *State* v. *Williamson,* 212 Conn. 6, 562 A.2d 470 (1989); *State* v. *Santangelo,* 205 Conn. 578, 534 A.2d 1175 (1987); *State* v. *Pollitt,* 205 Conn. 61, 530 A.2d 155 (1987); *State* v. *Sanford,* 25 Conn. App. 255, 594 A.2d 477, cert. denied, 220 Conn. 912, 597 A.2d 338 (1991); *State* v. *Dedrick,* 24 Conn. App. 518, 589 A.2d 1241 (1991); *State* v. *Coriano,* 12 Conn. App. 196, 530 A.2d 197, cert. denied, 205 Conn. 810, 532 A.2d 77 (1987). Thus, on the basis of our experience to date, we cannot say that the reliability of verdicts in criminal cases requires a construction of § 749 (2) that would include tape recordings of 911 emergency telephone calls.

We emphasize that we do not decide in this case whether, upon a timely motion of the defendant and the requisite showing of good cause, Practice Book § 745[20] would permit the court to order the state to preserve and produce a 911 tape that had not yet been

[19] Indeed, that is true as well regarding the only other jurisdictions that have considered the effect on the trial of the erasure of a 911 tape recording assumed to have been a Jencks Act type statement. See, e.g., *Slye* v. *United States,* 602 A.2d 135, 138 n.6 (D.C. 1992) (harmless error); *Bartley* v. *United States,* 530 A.2d 692, 697 n.10 (D.C. 1987) (harmless error); see also *Seattle* v. *Duncan,* 44 Wash. App. 735, 723 P.2d 1156 (1986) (harmless error). The sole exception we have found is *People* v. *Parker,* 157 App. Div. 2d 519, 549 N.Y.S.2d 710 (1990), in which the New York Appellate Division reversed the conviction in apparent reliance on New York precedent requiring reversal per se whenever certain discovery material is not produced, regardless of the effect of the erasure of the tape on the fact-finding process.

[20] Practice Book § 745 provides: "In addition to any other disclosure or inspection permitted by these rules, the judicial authority may, upon motion of the defendant and a showing of good cause, order such other disclosure, inspection, testing or copying of specific information and materials as the interests of justice may require."

erased. Nor do we decide whether the erasure of the tape recording of a 911 call might, under appropriate factual circumstances, constitute a violation of a defendant's constitutional rights under the due process rubric of destruction of potentially exculpatory evidence. See, e.g., *State* v. *Cerilli,* 222 Conn. 556, 578 n.15, 610 A.2d 1130 (1992); *State* v. *Brosnan,* 221 Conn. 788, 812, 608 A.2d 49 (1992). We leave those questions to cases that properly present them. We decide only that Practice Book §§ 749 (2) and 752 do not require such preservation and production.

The judgment of the Appellate Court is affirmed.

In this opinion PETERS, C. J., CALLAHAN and GLASS, Js., concurred.

BERDON, J., dissenting. "A basic tenet of statutory construction is that when a statute [or Practice Book rule] is clear and unambiguous, there is no room for construction." (Internal quotation marks omitted.) *State* v. *Genotti,* 220 Conn. 796, 807, 601 A.2d 1013 (1992). The majority, however, has effectively amended General Statutes § 54-86b[1] and Practice Book § 749 (2)[2] by introducing a new principle that unambiguous lan-

---

[1] General Statutes § 54-86b provides: "(a) In any criminal prosecution, after a witness called by the prosecution has testified on direct examination, the court shall on motion of the defendant order the prosecution to produce any statement oral or written of the witness in the possession of the prosecution which relates to the subject matter as to which the witness has testified, and the court shall order said statement to be delivered directly to the defendant for his examination and use.

"(b) If the prosecution fails to comply with the order of the court, the court shall strike from the record the testimony of the witness and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared."

[2] Practice Book § 749 provides in relevant part: "The term 'statement' . . . means . . . (2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement."

guage requires strict application only where the language is *"absolutely* clear and unambiguous . . . and where no inherent ambiguity is disclosed by reference to the facts of the case." (Emphasis in original.) In other words, this court may, at any time, conclude that some language is not *absolutely* clear and rewrite either the rule or the statute.[3] Unfortunately, this is often done. See, e.g., *Jones* v. *Mansfield Training School,* 220 Conn. 721, 726–27, 601 A.2d 507 (1992).[4]

Even applying the majority's new tenet of construction, I fail to see what is not *"absolutely"* clear about

---

[3] "The application of Connecticut's rules of construction has become exceedingly complex and unpredictable. This is due, in part, to the fact that the rule prohibiting a court from looking behind the plain and unambiguous language of an act has become blurred to the point where the court will often look beyond that language without first deciding the threshold issue of whether an ambiguity exists. . . . Thus, one can never be certain, no matter how clear and unambiguous the language of an act may be, that the court will not look beyond that language and interpret it in a manner contrary to its literal meaning. Such action, however, disregards the court's prior warning that the '[g]eneral rules of construction are but imprecise and uncertain guides to the legislative intent behind an ambiguous enactment, and we must employ them with caution.' [*Levin-Townsend Computer Corporation* v. *Hartford,* 166 Conn. 405, 411, 349 A.2d 853 (1974).] Where these rules are employed with respect to an unambiguous statute, the likelihood of an erroneous interpretation is significantly increased." R. Williams, "Statutory Construction in Connecticut: An Overview and Analysis," 62 Conn. B.J. 307, 343 (1988).

[4] The construction of General Statutes § 54-86b on the part of the majority, when the statute is unambiguous, has constitutional implications. "Although this court has the final word on the interpretation of our state statutes, there is a 'higher authority'—that is, the constitution of the state of Connecticut. Article second of the Connecticut constitution provides in part: 'The powers of government shall be divided into three distinct departments, and each of them confided to a separate magistracy; to wit, those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.' By placing a construction on this statute that is contrary to its plain and unambiguous text, the majority encroaches on that which is solely reserved to the legislative branch of our government. 'In the field of legislation, the legislature is supreme. Courts must apply legislative enactments according to their plain terms.' *State* v. *Malm,* 143 Conn. 462, 467, 123 A.2d 276 (1956)." *Jones* v. *Mansfield Training School,* 220 Conn. 721, 737–38, 601 A.2d 507 (1992) (*Berdon, J.,* dissenting).

the 911 tape being a "statement." Indeed, the majority never explains what is not absolutely clear about it. Section 749 provides, in part, that a "statement" is a "stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement." The tape of the victim's 911 call clearly falls within the Practice Book edict that the state produce any "statement" of a prosecution witness to the defense.

Likewise, § 54-86b has clear reference to the recordings of a witness on a 911 tape. Section 54-86b provides that the state shall produce a "statement oral or written." Reason and logic provide that an "oral" statement encompasses a recording of a telephone conversation. A 911 emergency telephone call from the victim, which was made on the day of the crime and which allegedly described the type of crime and provided the identity of the assailant, must surely be such an oral statement.

The majority does not rely only on the fact that § 749 (2) is not "absolutely clear and unambiguous." They also create another new rule. According to the majority, even if the language to be construed is clear "on its face," this court will avoid enforcing it if "a literal interpretation . . . would lead to unworkable results . . . ." The trouble with this is twofold.

First, the majority's reliance on *Fairfield Plumbing & Heating Supply Corporation* v. *Kosa,* 220 Conn. 643, 650–51, 600 A.2d 1 (1991), as precedent is misplaced. The court in *Kosa* construed an *ambiguous* statute and merely held the following: "[C]ompelling principles of statutory construction . . . require us to construe a statute in a manner that will not thwart its intended purpose or lead to absurd results. . . . We must avoid

a construction that fails to attain a rational and sensible result that bears directly on the purpose the legislature sought to achieve." (Citations omitted; internal quotation marks omitted.) Id. Of course, "[w]e have consistently held that if a statute is clear and unambiguous, there is no room for construction." *Murray* v. *Lopes,* 205 Conn. 27, 33, 529 A.2d 1302 (1987). Second, and more important, there is nothing to indicate that preserving 911 tapes is "unworkable." There may be some costs involved, but they are insignificant.[5] This is especially so if a reasonable limitation is placed upon preserving the tapes, for example one year, as the Appellate Court suggested.

Indeed, the majority of the Appellate Court points out that the "state acknowledges that the 911 tape is a statement within the meaning of Practice Book § 749 (2) . . . ." *State* v. *Cain,* 25 Conn. App. 503, 509, 596 A.2d 449 (1991).

Practice Book § 752 and General Statutes § 54-86b provide that after a state witness testifies on direct, upon motion made by the defendant, the court shall order the state to provide to the defense any prior statement made by that witness. Section 54-86b further provides: "If the prosecution fails to comply with the order of the court [to provide to the defense any prior statement made by a state witness,] the court shall strike from the record the testimony of the witness and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared." Accordingly, the testimony of the victim should have been stricken.

Moreover, the failure to provide the defense with the tape of the victim's 911 call implicates the defendant's

---

[5] It is interesting that the state and its subdivision do not have any problem preserving 911 tapes when they aid in the prosecution of a person. See, e.g., *State* v. *Traficonda,* 223 Conn. 273, 612 A.2d 45 (1992).

right to confrontation under the state and federal constitutions. "We have recognized that, under certain circumstances, the state's failure to produce material to which the defendant is entitled under General Statutes § 54-86b and Practice Book § 752 may adversely affect a defendant's ability to cross-examine a state's witness and thereby infringe upon his constitutional right of confrontation. *State* v. *Johnson,* [214 Conn. 161, 173–74, 571 A.2d 79 (1990)]. In such a case, [an appellate] court would be warranted in strictly applying the harmless error doctrine to require the state to prove harmlessness beyond a reasonable doubt. Id.; *State* v. *Williamson,* [212 Conn. 6, 22–23, 562 A.2d 470 (1989)]. In determining the effect of the state's nonproduction on the defendant's opportunity to cross-examine, we have considered such factors as the trial or reviewing court's access to the unproduced material, the declarant's adoption of a counterpart transcript within a short time after making the statement, and the extent to which the defendant's conviction rested on the testimony of the witness whose pretrial statement had been destroyed. See *State* v. *Johnson,* supra, 174–75 (the fact that the witness reviewed and signed within three days a typed transcription of his statement and the fact that the defendant's conviction did not rest solely on the testimony of that witness were major factors in applying the more probable than not standard to the harmless error inquiry); *State* v. *Williamson,* supra (the fact that the victim-witness did not review the transcription of her most detailed statement for seven months and that the defendant's conviction rested solely on the testimony of the victim-witness were major factors in determining that the stricter standard of proof would not have been unwarranted)." *State* v. *Belle,* 215 Conn. 257, 269–70, 576 A.2d 139 (1991).

When the factors set forth in *Belle* are applied to this case, it is apparent that the statements made by the victim

and recorded on the 911 tape were not accessible to the trial or appellate courts and were not transcribed. More importantly, the defendant's conviction rested *squarely* on the testimony of the victim. Accordingly, I agree with the well reasoned dissent of Judge Daly in the Appellate Court that "the defendant's right to confront and cross-examine the victim was implicated and the state should have been held to prove beyond a reasonable doubt that the [nonproduction of the] missing 911 statement was harmless." *State* v. *Cain,* supra, 527–28.

"From the evidence adduced at trial, the state could not prove that the [nonproduction of the] missing 911 statement was harmless beyond a reasonable doubt. The defendant's conviction rested squarely on the victim's testimony in this case and her testimony contained critical inconsistencies. On direct examination, the victim testified that the first person she called after the incident was her friend. The victim claimed that she told her friend that the defendant had assaulted her. She then testified that after this conversation she called 911 and reported: 'I was raped.' During her cross-examination, the victim testified that she told her friend, '[the defendant] raped me,' not '[the defendant] hit me,' as her friend had testified. She then explained that in her prior testimony she had used the word 'assaulted' because she was afraid to use the term 'rape,' and that she had, in fact, told her friend that she was raped. During recross[-examination], the victim reaffirmed the sequence of her telephone calls and that she had reported to the 911 operator that she had been raped. The victim's friend testified that the victim called and said '[the defendant] hit me,' but she was not certain of the wording, and later testified that it sounded like '[the defendant] hit me.' The state submitted into evidence the victim's statement to the police

on the day she called 911. The statement contained the victim's accusation that the defendant had raped her on that day." Id., 527.

The credibility of the victim was on the line and it was a critical issue in the case. Under the circumstances, even if we apply a standard that the state need prove only that it was more probable than not that the state's nonproduction was harmless; *State* v. *Johnson,* supra, 175; a reversal is required. Although we are unable to determine what was on the 911 tape, its production would have given the defendant the opportunity to prove that what happened was not, in fact, a sexual assault. In short, I am bewildered by the majority opinion.

Accordingly, I dissent.