# STATE OF CONNECTICUT *v.* RUSSELL JOHNSON
## (AC 20349)

Foti, Schaller and Dranginis, Js.

Argued September 10—officially released December 18, 2001

*Lisa J. Steele,* special public defender, for the appellant (defendant).

*Robert M. Spector,* assistant state's attorney, with whom, on the brief, was *Michael Dearington,* state's attorney, and *Gary W. Nicholson,* senior assistant state's attorney, for the appellee (state).

*Opinion*

SCHALLER, J. The defendant, Russell Johnson, appeals from the judgment of conviction, rendered after a jury trial, of attempt to commit assault in the first degree in violation of General Statutes §§ 53a-59 (a) (1) and (5),[1] and 53a-49 (a) (2),[2] attempt to commit assault of a peace officer in violation of General Statutes (Rev. to 1997) § 53a-167c (a) (1), as amended by Public Acts 1998, No. 98-41,[3] and General Statutes § 53a-49 (a) (2),

[1] General Statutes § 53a-59 (a) provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . or (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm."

[2] General Statutes § 53a-49 (a) (2) provides in relevant part: "A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he . . . (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime."

[3] General Statutes (Rev. to 1997) § 53a-167c (a) (1), as amended by Public Acts 1998, No. 98-41, provides in relevant part: "A person is guilty of assault of a peace officer . . . when, with intent to prevent a reasonably identifiable peace officer . . . from performing his or her duties, and while such peace officer . . . is acting in the performance of his or her duties, (1) such person causes physical injury to such peace officer . . . ."

carrying a pistol or revolver without a permit in violation of General Statutes (Rev. to 1997) § 29-35 (a)[4] and possession of narcotics with intent to sell in violation of General Statutes § 21a-277 (a).[5] The defendant claims that the trial court improperly (1) admitted evidence that he attempted to fire a pistol at a police officer, (2) denied the defendant's motion to either dismiss the charges of attempt to commit assault or to exclude police testimony because of the destruction of recorded police radio broadcasts, thereby violating the defendant's state constitutional due process rights, and (3) refused to instruct the jury that it could draw an adverse inference from the state's failure to preserve the recorded police radio broadcasts. We affirm the judgment of the trial court.

The following facts and procedural history are relevant to the defendant's appeal. On November 28, 1998, the Hamden police were seeking to arrest a suspect in a domestic violence dispute. Believing that the suspect had fled to New Haven, they informed New Haven police officers of their search and provided a description of the suspect. In their broadcast to the New Haven police, the Hamden police described the suspect as a

---

[4] General Statutes (Rev. to 1997) § 29-35 (a) provides in relevant part: "No person shall carry any pistol or revolver upon his person, except when such person is within his dwelling house or place of business, without a permit to carry the same issued as provided in section 29-28 . . . ."

[5] General Statutes § 21a-277 (a) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marijuana, or a narcotic substance, except as authorized in this chapter, for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned; and for a second offense shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for each subsequent offense, shall be imprisoned not more than thirty years and may be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned."

black male, approximately five feet, eight inches in height, 160 pounds, and wearing a dark brown jacket and dark pants. The complainant's Hamden address is on Bowen Street near the New Haven line, and Bowen Street becomes Sherman Avenue when it crosses into New Haven. The Hamden police broadcast stated that the suspect had been seen walking along Sherman Avenue in New Haven within the previous ten minutes.

During the evening of November 28, 1998, two New Haven police officers, Justin Kasperzyk and Martin Tchakirides, were stationed in New Haven near the Hamden line. Tchakirides was driving a police cruiser, and Kasperzyk was in the front passenger seat. After receiving the Hamden police broadcast, Tchakirides and Kasperzyk drove along Sherman Avenue, where they saw the defendant walking. The defendant matched the suspect's description, and the officers thought that he was the person wanted by the Hamden police.

Tchakirides and Kasperzyk drove to the defendant and told him to stop so that they could speak to him. The officers then asked the defendant to approach the car. Instead, the defendant walked behind the car with his hand in his pocket. Kasperzyk stepped out of the car, and the defendant fled. Tchakirides stayed with the car while Kasperzyk chased the defendant on foot. Kasperzyk pursued the defendant along a driveway and into the backyards behind Percival Street in New Haven. Kasperzyk maintained periodic radio contact with Tchakirides, and Tchakirides was able to monitor the chase from the cruiser and shine its spotlight into the yards.

The defendant then ran into a garage behind Carmel Street in New Haven with Kasperzyk in close pursuit. The defendant immediately ran out of the garage and, as Kasperzyk shined his flashlight into his face, the

defendant pointed a gun at Kasperzyk's head. Tchakirides saw the defendant run into the garage, and witnessed the confrontation between Kasperzyk and the defendant. The defendant attempted to escape, but Kasperzyk tackled him. Tchakirides arrived soon thereafter and, together, he and Kasperzyk fought with and subdued the defendant until other police units arrived. Kasperzyk told Tchakirides that the defendant had tried to shoot him. During a search of the garage area, Kasperzyk found a gun that later was identified as belonging to the defendant. The defendant did not have a city or state permit to carry a firearm.

The police later searched the defendant and found a prescription bottle with fifteen bags of a white, rocklike substance that later was determined to be freebase cocaine. The defendant admitted that he sold narcotics to support himself and that some of the narcotics were for his personal use. Additional facts will be set forth where necessary to the resolution of the defendant's appeal.

I

A

The defendant first claims that the court improperly admitted evidence that he attempted to fire a pistol at Kasperzyk. Specifically, the defendant argues that the court abused its discretion by admitting into evidence expert testimony about an indentation on one of the cartridges found in the weapon. We are not persuaded.

The following additional facts are relevant to our resolution of the defendant's claim. When the defendant exited the garage, he pointed his gun at Kasperzyk's head and pulled the trigger.[6] Kasperzyk did not hear a

---

[6] At trial the following colloquy, in relevant part, occurred between the prosecutor and Kasperzyk:

"[Prosecutor]: Now, as you continue chasing him to the area where that garage structure is located . . . could you tell the jury what happened, sir? What did you do?

clicking sound at the time the defendant pointed the gun at him. After the officers subdued the defendant, Kasperzyk located the gun in the garage and gave it to Tchakirides. Tchakirides examined the pistol and removed the cylinder from the weapon to make it safe. Upon examination, Tchakirides noted that the cylinder contained five chambers containing four live rounds and one empty chamber. At that time, he noticed that the pistol's firing pin[7] rested over the empty chamber. Tchakirides did not fire or attempt to fire the gun at any time before he turned it in as evidence for use at trial.

The state introduced the testimony of James Stephenson, a ballistics expert. Stephenson testified that the weapon is a .22 caliber, five shot, single action revolver. A single action revolver requires the user to pull the hammer back manually for each and every attempt to fire the weapon. Pulling back on the hammer of a properly functioning single action weapon will rotate the cylinder and align the next chamber with the barrel of the gun. Stephenson testified that the defendant's gun had a defective firing mechanism. Specifically, the cylinder did not rotate properly and, therefore, did not align the chamber with the barrel. That type of malfunction also can cause the firing pin to strike the back side of the cylinder or a portion of the cartridge when released.

Stephenson testified further about the four live rounds that Tchakirides found in the weapon. Stephenson stated that of the four cartridges in the weapon,

* * *

"[Witness]: I followed [the defendant]. We went into the next yard on Carmel Street, and as he turned into the garage, he came right back out like he was going to turn the corner, and as he came out I shot a light in his face about two feet away from him. He took a gun he had in his hand and stuck it right in my face, and was like this with his face, and his teeth grinding down as he's pressing the trigger, like squeezing, looking right at me."

[7] The firing pin on that weapon is a protrusion of the hammer.

three were silver in appearance and one was brass. He further explained that the brass cartridge had on it a firing pin impression consistent with firing having occurred, but not with enough force to cause the cartridge to fire. Stephenson also testified that he could not state whether the cartridge misfired because of a malfunction in the weapon or in the cartridge itself. Finally, Stephenson testified that there is no way to determine when the impression was made on the cartridge.

In his motion to preclude Stephenson's testimony regarding the indentation, the defendant stated that, among other things, Kasperzyk did not hear the defendant attempt to fire the weapon, the defendant had fired the weapon two weeks before the incident, the hammer was resting on an empty chamber when inspected by Tchakirides, there was no recording of where the removed cartridges were positioned in the weapon and there was no way to determine when the mark was made. The defendant argued, therefore, that the firing pin impression evidence was speculative, and "the admission of such evidence unduly prejudiced the defendant." At trial, the prosecutor responded that "whether or not he fired the gun, or attempted to fire it, is a matter of inference. . . . I think it's relevant evidence before the jury." The court ruled that the evidence of the firing pin mark was relevant and admissible.[8] The defendant did not object to the court's ruling on the ground of relevance.

"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . [E]vidence need not exclude all other possibilities

---

[8] At the conclusion of the hearing on the defendant's motion, the court made the following ruling: "The motion is denied. This is evidence the jury can consider. It could be subject to cross-examination argument, but it shouldn't be excused from the jury. The motion is denied. This is relevant evidence for this case, given the facts as I have heard them thus far."

[to be relevant]; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . [T]he fact that the evidence is susceptible of different explanations or would support various inferences does not affect its admissibility, although it obviously bears upon its weight. So long as the evidence may reasonably be construed in such a manner that it would be relevant, it is admissible." (Internal quotation marks omitted.) *State* v. *Andresen*, 256 Conn. 313, 336–37, 773 A.2d 328 (2001).

"It is well settled that questions of relevance are committed to the sound discretion of the trial court." (Internal quotation marks omitted.) *Pickel* v. *Automated Waste Disposal, Inc.*, 65 Conn. App. 176, 184, 782 A.2d 231 (2001). "Rulings on such matters will be disturbed on appeal only upon a showing of a clear abuse of discretion." (Internal quotation marks omitted.) *New Haven* v. *Local 884, Council 4, AFSCME, AFL-CIO*, 58 Conn. App. 746, 759, 755 A.2d 885, cert. denied, 254 Conn. 929, 761 A.2d 753 (2000).

The state presented testimony that the defendant pointed a gun at Kasperzyk's head and pulled the trigger. Testimony by the state's expert, Stephenson, established that the gun was defective in a manner that could explain how the hammer in the defendant's gun could strike the cartridge without actually discharging the bullet. The state argues that the indentation on the bullet was offered as one explanation of how the defendant could have pulled the trigger without discharging the gun and that the defendant's argument makes several unwarranted assumptions.[9]

The indentation on the cartridge supported the conclusion that the defendant attempted to fire his weapon

---

[9] The state argued, inter alia, that "[the defendant] assumes that he did not rotate manually the gun's cylinder after he held it up to Kasperzyk's head and before Tchakirides examined it . . . [and] he assumes that, at most, he pulled the trigger once . . . ."

during the confrontation with Kasperzyk. We conclude that the court did not abuse its discretion by allowing expert testimony about the indentation on the cartridge.

B

The defendant also claims that even if the evidence regarding the indentation was relevant, the court should have excluded it because its prejudicial tendency out-weighed its probative value and because it had great potential to mislead the jury. The state argues correctly that the defendant did not raise that argument at trial and, therefore, the claim is unpreserved. We agree.

"Our review of evidentiary rulings made by the trial court is limited to the specific legal ground raised in the objection [to the trial court]. . . . This court reviews rulings solely on the ground on which the par-ty's objection is based." (Internal quotation marks omit-ted.) *State* v. *Paris*, 63 Conn. App. 284, 291, 775 A.2d 994, cert. denied, 257 Conn. 909, 782 A.2d 135 (2001).

At trial, defense counsel failed to object specifically to the indentation testimony on the ground of prejudice. Rather, counsel stated: "I don't believe any evidence as to that indentation should be allowed in." In response, the prosecutor argued: "I think it's relevant evidence, and I don't really, frankly, understand the claim of what the basis of the claim is here on the motion, it's claiming it's actually prejudicial. The state is going to come in where it's already admitted that he fired the weapon. I think it's relevant evidence before the jury." The court then inquired of defense counsel: "Anything further?" Defense counsel responded: "No, Your Honor." The court then ruled on the defendant's motion, clearly on the basis of relevance, stating: "This is relevant evidence for this case, given the facts as I have heard them thus far."[10] Therefore, because the defendant did not raise

---

[10] See footnote 8.

prejudice as a ground for his objection at trial, his claim is unpreserved and we decline to review it.[11] See id.

## II

The defendant next claims that the court violated his state constitutional right to due process by denying his motion to dismiss the charges of attempt to commit assault or to exclude certain police testimony because the police destroyed recorded police radio broadcasts made on the evening of his arrest. We disagree.

"We must first consider the standard of review where a claim is made that the court failed to grant a motion to dismiss. Our standard of review of a trial court's . . . conclusions of law in connection with a motion to dismiss is well settled. . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts . . . . Thus, our review of the trial court's ultimate legal conclusion and resulting [denial] of the motion to dismiss will be de novo." (Internal quotation marks omitted.) *State* v. *Weiner*, 61 Conn. App. 738, 747, 767 A.2d 1220, cert. denied, 256 Conn. 902, 772 A.2d 600 (2001).

The following additional facts and procedural history are relevant to the resolution of the defendant's claim. On September 9, 1999, the defendant filed a motion to dismiss the charges of attempt to commit assault or, in the alternative, to exclude Kasperzyk's testimony because the audiotapes of the radio communications of November 28, 1998, were destroyed or unavailable. The court conducted an evidentiary hearing on September 14, 1999, and subsequently denied the motion. The parties submitted the following testimony at the hearing and at other times during the trial.

---

[11] The defendant also claims that the admission of the challenged testimony was not harmless error. Because we decline to review his claim that the testimony was unduly prejudicial, we need not address that issue.

Kasperzyk wore a radio on his uniform that allowed him to remain in communication with his partner and the police station. At the time of the incident, the New Haven police recorded all police radio transmissions on multitrack audiotape. The audiotape also contains recordings of 911 calls. The police changed the audiotape every twenty-four hours and normally retained them for thirty days. Kasperzyk made several broadcasts during the foot chase, but made no broadcasts when the defendant pointed the gun at his head.

Subsequent to the incident, Detective Peter Moller of the New Haven police department interviewed Kasperzyk and Tchakirides. He did not review or preserve the New Haven police audiotape of the radio communications made on the evening of November 28, 1998. Neither the defendant nor the state requested that the police preserve the audiotape at that time, nor did they make such a request during the subsequent thirty days. Pursuant to their policy of preserving the audiotape for at least thirty days, the police retained the audiotape until they reused it on February 8, 1999, seventy-two days after the incident occurred.

The defendant was arraigned on November 30, 1998. The court appointed trial counsel from the public defender's office on that date. On January 28, 1999, the case was transferred from Part B to Part A, and on February 9, 1999, the defendant received new trial counsel. On February 22, 1999, the state requested that the police preserve the audiotape of November 28, 1998. On February 26, 1999, the defendant filed a motion to preserve all audiotape related to the incident. Following the September 14, 1999 oral ruling by the court denying the defendant's motion to dismiss or exclude testimony, the court filed a written memorandum of decision noting that the defendant had failed to request that the tapes be made available until more than twice the customary retention period had passed. The court con-

cluded that under *State* v. *Asherman*, 193 Conn. 695, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985),[12] the state's failure to turn over the audiotapes did not violate the defendant's state constitutional right to due process.[13]

The defendant argues that the state had a duty to preserve the audiotape of the November 28, 1998 broadcasts and that its failure to do so violated the defendant's right to due process. The state responds that it had no such duty and, even if it did, the failure to preserve the tape did not violate the defendant's due process rights under *Asherman*.[14] We agree with the state that it had no duty to preserve the tape.

In *State* v. *Cain*, 223 Conn. 731, 613 A.2d 804 (1992), our Supreme court concluded that "despite the fact that

---

[12] "[I]n determining whether the state's failure to preserve evidence has resulted in a violation of a defendant's due process right under article first, § 8, a trial court must employ the [*Asherman*] balancing test, weighing the reasons for the unavailability of the evidence against the degree of prejudice to the accused. More specifically, the trial court must balance the totality of the circumstances surrounding the missing evidence, including the following factors: the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence." (Internal quotation marks omitted.) *State* v. *Kilroy*, 61 Conn. App. 164, 173, 763 A.2d 59 (2000).

[13] Article first, § 8, of the constitution of Connecticut provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

[14] In its August 10, 2000 memorandum of decision on the defendant's motion to dismiss the charges of attempt to commit assault or to exclude the testimony of Kasperzyk, the court made the following factual findings: "The New Haven police department records radio broadcasts on a twenty-four hour taping system. Each twenty-four hour tape has several tracks. One track is used for 911 calls, and others are used to record police radio transmissions." In its discussion, the court applied the *Asherman* test after "[a]ssuming, without deciding, that Officer Kasperzyk's radio transmissions were 'statements' within the meaning of Practice Book § 40-13 . . . ." The court noted, however, that "[t]here is a serious question as to whether such broadcasts are statements *in light of the fact that they are recorded using the same system that records 911 calls.*" (Emphasis added.)

the language of Practice Book § 749 (2) [now § 40-15 (2)], read literally, would cover the tape recording of a 911 telephone call, it is not within the intent of that language to cover such a tape recording and that, therefore, a tape recording of a 911 telephone call is not a statement within the meaning of [§ 40-15 (2)][15] that is subject to preservation and to disclosure. . . ." (Internal quotation marks omitted.) *State* v. *Cain*, supra, 738–39.

In *Cain*, "[o]ur Supreme Court recognized that a rule requiring the preservation of every twenty-four hour tape would impose a heavy burden on municipalities." *State* v. *Wityak*, 29 Conn. App. 455, 464, 616 A.2d 276, aff'd, 226 Conn. 470, 627 A.2d 1341 (1993). In *Wityak*, this court considered whether police radio broadcasts recorded on the same tapes as 911 calls were statements as defined by Practice Book § 749, now § 40-15 (2). In concluding that such recordings are not "statements," this court reasoned that "[t]he burden of storing the recordings of the town radio and the police radio broadcasts would be as heavy as the burden for the storage and administration of tapes of the 911 emergency telephone calls because the same twenty-four hour tape records 911 calls, town radio broadcasts, and police broadcasts. The same intolerable financial and administrative burdens for the preservation of 911 tapes as those enumerated in *Cain* would pertain to the storage of the tapes at issue here." *State* v. *Wityak*, supra, 464.

On appeal, our Supreme Court stated that this court "properly recognized that [t]he same rationale relating

---

[15] A "statement," as used in Practice Book § 40-13, is defined in Practice Book § 40-15 as: "(1) A written statement made by a person and signed or otherwise adopted or approved by such person; or

"(2) A stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by a person and recorded contemporaneously with the making of such oral statement."

to tapes of 911 emergency telephone calls applies to the recordings of the [police radio broadcasts]." (Internal quotation marks omitted.) *State* v. *Wityak*, 226 Conn. 470, 474, 627 A.2d 1341 (1993).

In the present case, the court found that the New Haven police department records radio transmissions using twenty-four hour tapes, that each tape has several tracks, and that "[o]ne track is used for 911 calls and others are used to record police radio transmissions."[16] Therefore, we conclude that the police did not have a duty to preserve the police radio transmission audiotapes in this case. See id., 471–72.[17] Although we reach our result for reasons different from those set forth by the trial court, the practical effect is to affirm the trial court's judgment. See *State* v. *Lewis*, 245 Conn. 779, 801, 717 A.2d 1140 (1998); see also *Ivey, Barnum & O'Mara* v. *Indian Harbor Properties, Inc.*, 190 Conn. 528, 532, 461 A.2d 1369 (1983).

The defendant further argues that the audiotape was evidence subject to disclosure pursuant to Practice Book § 40-11.[18] Specifically, the defendant argues that

---

[16] See footnote 14.

[17] Because we conclude that the police had no duty to preserve the tape, we decline to review the trial court's due process violation analysis under *Asherman*.

[18] Practice Book § 40-11 provides in relevant part: "(a) Upon written request by a defendant . . . the prosecuting authority . . . shall promptly, but no later than forty-five days from the filing of the request, unless such time is extended by the judicial authority for good cause shown, disclose in writing the existence of and allow the defendant in accordance with Section 40-7, to inspect, copy, photograph and have reasonable tests made on any of the following items:

"(1) Exculpatory information or materials;

"(2) Any . . . tangible objects . . . within the possession, custody or control of any governmental agency . . . which are material to the preparation of the defense . . .

"(b) In addition to the foregoing, the defendant shall be entitled to disclosure of exculpatory materials in accordance with any applicable constitutional and statutory provisions."

the state had a duty to disclose the audiotapes of November 28, 1998, because they were potentially exculpatory. In other words, the defendant argues that the taped radio transmission, which we have concluded the police have no duty to preserve, is information or material subject to disclosure by the prosecuting authority upon written request by the defendant pursuant to Practice Book § 40-11.

"Our Supreme Court has . . . considered similar claims involving the erasure of tape recorded evidence. . . . See *State* v. *Mullings*, 202 Conn. 1, 519 A.2d 58 (1987)." (Citation omitted.) *State* v. *Sims*, 12 Conn. App. 239, 248, 530 A.2d 1069, cert. denied, 206 Conn. 801, 535 A.2d 1315 (1987). "In [*Mullings*] . . . the destruction of a [witness'] tape recorded statement to the police was at issue. The court held that in the absence of bad faith on the part of the police department, we have continued to adhere to [a] balancing test . . . in determining whether a [witness'] testimony should be stricken. . . . Whether or not sanctions for nondisclosure should be imposed depends upon the extent of the state's culpability in failing to make disclosable material available to the defense, when weighed against the amount of prejudice to the defense which resulted from the nondisclosure. . . . [T]his approach gives broad discretion to the trial court." (Citations omitted; internal quotation marks omitted.) *State* v. *Sims*, supra, 249.

In this case, the court found that the destruction of the audiotape was not the result of bad faith on the part of the police. The court also noted that the police retained the tapes for twice as long as the customary period and that during that time "the defense had an equal right to seek (and likely obtain) a court order directing [the] same." Furthermore, the court noted that the defendant was not prejudiced as a result of the

destruction of the audiotape.[19] We conclude that the court did not improperly deny the defendant's motion to dismiss the charges of attempt to commit assault or to exclude the testimony of Kasperzyk.

## III

The defendant claims finally that the court abused its discretion in failing to instruct the jury that it could draw an adverse inference from the state's failure to preserve the audiotapes. The defendant argues that the state was in a position to preserve potentially exculpatory evidence and that its failure to do so warranted an adverse inference instruction to the jury. We do not agree.

"Although an adverse inference instruction may be appropriate under certain circumstances, a trial court is not required to give an adverse inference instruction in every case involving missing evidence." *State* v. *Lyle*, 40 Conn. App. 288, 292, 670 A.2d 871, cert. denied, 237 Conn. 903, 674 A.2d 1332 (1996). "[T]o prevail on appeal, [the defendant] must show both that the trial court abused its discretion in refusing to give the adverse inference instruction on the [missing evidence] and that it was more probable than not that the failure to give the requested instruction affected the result of the trial." Id., 292–93. The defendant's claim on appeal will fail unless both prongs are satisfied.

"The failure to produce [evidence] for trial [that] is available and [that] a party would naturally be expected

[19] In its memorandum of decision in which the court denied the defendant's motion to dismiss, the court noted that "[a]s to prejudice to the defendant, any claim that the broadcasts contained information that would materially contradict Officer Kasperzyk's trial testimony is speculative. . . . [N]o radio transmission was made during the key time when the officer confronted the defendant at the garage. In addition, on November 28, 1998, Officer Kasperzyk gave a sworn statement concerning his apprehension and confrontation with the defendant. This statement was provided to the defense for use during its cross-examination of the officer. . . . [T]he defendant was not prejudiced by the unavailability of the radio broadcast tape."

to [produce] warrants an adverse inference instruction against the party who would be expected to [produce that evidence]. *Secondino* v. *New Haven Gas Co.*, 147 Conn. 672, 674–75, 165 A.2d 598 (1960)." *State* v. *Lyle*, supra, 40 Conn. App. 293. "In such a situation there is a logical nexus between the failure to [produce the evidence] and an adverse inference. In other words, it makes sense to infer that the [evidence], had [it been] available . . . would [have been] adverse to the party who would naturally be expected to [produce] that [evidence] but failed to do so." (Internal quotation marks omitted.) Id.[20]

Here, "there is no logical nexus between the inability of the state to produce the [audiotape] and an inference that, if it were available, it would be favorable to the defendant and adverse to the state. An inference to be drawn must be logical and reasonable and strong enough so that it can be found that it is more probable than not that the fact to be inferred is true." "The adverse inferences that the defendant claims the jury would have drawn had it been instructed to do so, amount to nothing more than speculation on the part of the defendant."[21] *State* v. *Figueroa*, 235 Conn. 145, 175, 665 A.2d 63 (1995). Kasperzyk made no radio broadcasts during the part of the pursuit when the defendant pointed the gun at his head. It is not reasonably probable, in light of the record, that the jury would have found that the events surrounding the apprehension of

---

[20] In *State* v. *Malave*, 250 Conn. 722, 738, 737 A.2d 442 (1999) (en banc), cert. denied, 528 U.S. 1170, 120 S. Ct. 1195, 145 L. Ed. 2d 1099 (2000), our Supreme Court abandoned the so-called missing witness rule in criminal cases, thereby abrogating a party's entitlement to an adverse inference charge in criminal cases involving the admission of testimony given by a "missing witness." Although *Malave* clearly applies in cases involving a missing *witness*, it is not clear whether *Malave* condemns the application of a *Secondino* analysis to criminal cases involving the failure to produce other forms of tangible missing evidence.

[21] See footnote 19.

the defendant varied from the witness' description of those events, nor is it reasonably probable that the jury would have found the officers to be unreliable witnesses.

The court's refusal to provide the jury with an adverse inference instruction did not constitute an abuse of discretion. Therefore, the defendant was not entitled to an adverse inference instruction under the circumstances.

The judgment is affirmed.

In this opinion the other judges concurred.