[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE MOTION TO SET ASIDE THE VERDICT
This matter comes before the court in connection with the motion to set aside a jury verdict and to order a new trial (#116), filed by the plaintiff, Jeffrey Pierce (hereafter the "motion"). After considering the evidence, the parties' submissions, and their arguments, the court denies the motion, for the reasons set forth below.
 I. BACKGROUND
This personal injury case was tried to a jury on nine trial days, commencing on November 16, 2001. On December 5, 2001, the jury returned a verdict for the defendant, Patrick Fales, d/b/a Downeast Logging and Firewood. The motion was filed on December 11, 2001. By order, the court directed the parties to submit briefs and scheduled the motion for oral argument. Fales' memorandum in opposition (#117) was filed on December 17, 2001. Pierce's memorandum in support of his motion (#118) was filed on January 17, 2002. On March 26, 2002, the court held a hearing in connection with the motion, at which the parties presented oral argument. CT Page 5741
In the motion, Pierce raises two grounds upon which he asserts that the verdict should be set aside as contrary to the evidence and governing law: (1) the jury could not have reached the conclusion that Fales' conduct was reasonable and within the standard of care for the reasonably prudent and careful logger; and (2), the court erred in admitting into evidence testimony concerning Pierce's consumption of alcohol. He claims that the prejudicial effect of this evidence far outweighed its probative value. In his memorandum, Pierce raises an additional claim, that the court should have submitted the pleadings to the jury. The court addresses below each ground set forth by Pierce.
 II. STANDARD OF REVIEW
"When considering a motion to set aside the verdict, this court's function is to `determine whether the evidence, viewed in the light most favorable to the prevailing party' reasonably supports the jury's verdict.' (Internal quotation marks omitted.) Skrypiec v. Noonan,228 Conn. 1, 10, 633 A.2d 716 (1993)." Preston v. Wellspeak,62 Conn. App. 77, 81, 767 A.2d 1259 (2001). "A trial court may set aside a verdict on a finding that the verdict is manifestly unjust because, given the evidence presented, the jury mistakenly applied a legal principle or because there is no evidence to which the legal principles of the case could be applied." Card v. State, 57 Conn. App. 134, 138,747 A.2d 32 (2000). "A verdict should not be set aside, however, where it is apparent that there was some evidence on which the jury might reasonably have reached its conclusion." (Internal quotation marks omitted.) Kurti v. Becker, 54 Conn. App. 335, 337, 733 A.2d 916, cert. denied, 251 Conn. 909, 739 A.2d 1248 (1999).
"Before determining whether the granting of a motion to set aside is proper. the trial court must look at the relevant law that it gave the jury to apply to the facts, and at the facts that the jury could have found based on the evidence. The law and evidence necessarily define the scope of the trial court's legal discretion. . . . This discretion vested in the trial court is not an arbitrary or capricious discretion, but rather, it is legal discretion to be exercised within the boundaries of settled law. . . . This limitation on a trial court's discretion results from the constitutional right of litigants to have issues of fact determined by a jury. . . . The trial court, upon a motion to set aside the verdict, is called on to question whether there is a legal reason for the verdict and, if there is not, the court must set aside the verdict." (Citations omitted; internal quotation marks omitted.) Suarez v. Sordo,43 Conn. App. 756, 759-60, 685 A.2d 1144 (1996), cert. denied,240 Conn. 906, 688 A.2d 334 (1997).
"[T]he constitutional right of trial by jury includes the right to have CT Page 5742 issues of fact as to which there is room for a reasonable difference of opinion among fair-minded men passed upon by the jury and not by the court." (Internal quotation marks omitted.) Rejouis v. Greenwich Taxi,Inc., 57 Conn. App. 778, 783, 750 A.2d 501, cert. denied, 254 Conn. 906,755 A.2d 882 (2000). "[I]f there is a reasonable basis in the evidence for the jury's verdict, unless there is a mistake in law or some other valid basis for upsetting the result other than a difference of opinion regarding the conclusions to be drawn from the evidence, the trial court should let the jury work their will." (Internal quotation marks omitted.)Wichers v. Hatch, 252 Conn. 174, 189, 745 A.2d 789 (2000).
 III. DISCUSSION A. The Verdict
Although the motion, at page 1, lists as its first ground for the setting aside of the verdict that "[t]he jury could not reasonably have reached the conclusion that the defendant's conduct was reasonable and within the standard of care for the reasonably prudent and careful logger," no evidentiary basis for the contention is advanced. The court is "not required to review issues that have been improperly presented . . . through an inadequate brief." Connecticut National Bank v.Giacomi, 242 Conn. 17, 44-45, 699 A.2d 101
(1997). "Where a claim receives only cursory attention in the brief without substantive discussion, it is deemed to be abandoned." (Internal quotation marks omitted.) Golden v. Johnson MemorialHospital, Inc., 66 Conn. App. 518, 538,785 A.2d 234, cert. denied, 259 Conn. 902, ___ A.2d ___ (2001).
This ground is not addressed in Pierce's memorandum of law and was not raised in the oral argument. Apparently, Pierce chose not to pursue this claim beyond merely mentioning it in the motion. Accordingly, the court deems this ground to be abandoned.
Notwithstanding this finding of abandonment, the court finds also that, based on the evidence, the jury reasonably could have found, in accordance with its verdict, that Fales' conduct was reasonable, and was within the standard of care for a reasonably prudent logger, as well as that Pierce was more than fifty per cent responsible for his own injuries.
In this action, Pierce claims that Fales is liable to him for injuries he sustained in an April, 1998 incident, when a tree which Fales had partially cut down fell on Pierce. Pierce claims in the first count of his complaint that Fales was negligent in various ways, including leaving the CT Page 5743 tree in a dangerous condition, causing it to fall in an uncontrolled manner, failing to protect people from the risk that the partially-cut tree represented, failing to remedy its dangerous and defective condition, failing to warn Pierce of the tree's exact location and its dangerous and defective condition, and failing to inspect the tree. In his second count, based on premises liability, Pierce claims that Fales failed to maintain a safe premises for business guests, such as Pierce; created a dangerous and defective condition, yet failed to remedy it; failed to warn Pierce of the condition; knew or should have known of the dangerous and defective condition and failed to remedy it or warn Pierce; and failed to inspect the premises.
In response, Fales denied the allegations of liability and left Pierce to his proof as to his damages claims. In addition, he pleaded various special defenses, including: Pierce was inattentive and failed to be watchful of his surroundings in an area of known danger and peril; he failed to take reasonable precautions to observe known conditions that might be dangerous to him; he knowingly entered into a wooded area after being advised that there was a partially cut tree in said wooded area; he knowingly entered the wooded area when he knew it was dangerous and unsafe to do so; he failed to inspect the wooded area to determine the location of the partially cut tree which might be a danger to him; and he knowingly worked in close proximity to a partially cut tree knowing that said tree could fall at any time.
Based on the evidence, the jury reasonably could have found the following. On April 20, 1998, Fales was engaged in a logging operation at a wooded site in East Hampton, Connecticut. Pierce was involved in the operation as well, by selecting and marking trees to be harvested. Over the years, Pierce has been engaged in log brokerage, the business of buying and selling logs. Both Fales and Pierce were experienced in the logging industry.
The jury reasonably could have credited Fales' testimony. He stated that he is a professional logger and had worked with Pierce previously on logging jobs. On this job, they decided to drop trees and mark them in the woods. They had been on the job a week or less when the incident occurred. On the date of the incident, Pierce was working behind Fales, marking trees. Fales began to cut down a tree, when his chainsaw became stuck in it. Fales decided that, in order to cut down the tree, he would have to get his back-up chainsaw, which was in his truck, at the entrance to the wooded area. This required him to walk away from the area where the chainsaw-stuck tree was located.
As he was walking away from the area where his chainsaw was stuck, he encountered Pierce. They discussed the situation. Fales asked Pierce if CT Page 5744 Pierce had a hatchet; Pierce said he did not have one. Pierce was well aware of the hazardous condition in which the tree had been left. Fales had no reason to believe that Pierce would go near the tree, since it was in a dangerous condition, being partially cut, and since to do so would be in violation of standard logging industry practice in such situations. Instead of staying away from the area where Fales had been working, Pierce walked towards it. The tree, or part of it, then fell on Pierce, striking him on the head, and causing him to suffer injuries (including a scalp laceration and multiple rib fractures) which required him to be taken by ambulance for treatment and hospitalization.
As part of his defense, Fales presented Defendant's Exhibit O,29 C.F.R. § 1910.266, Regulations (Standards) of the United States Occupational Safety and Health Administration (OSHA), concerning logging operations.[1] These standards reflect that a zone of danger is considered to be that within two tree lengths. These standards define a "Danger tree" as "[a] standing tree that presents a hazard to employees due to conditions such as, but not limited to, deterioration or physical damage to the root system, trunk, stem, or limbs, and the direction and lean of the tree." Exhibit O, § 1910.266(c). Clearly, the jury reasonably could have found that the tree at issue met this broad definition.
The standards provide that the following procedures should be followed where a "danger tree" is present. "Each danger tree shall be felled, removed or avoided. Each danger tree, including lodged trees [a tree leaning against another tree or object which prevents it from falling to the ground] and snags [a standing dead tree or portion thereof] shall be felled or removed using mechanical or other techniques that minimize employee exposure before work is commenced in the area of the danger tree. If the danger tree is not felled or removed, it shall be marked and no work shall be conducted within two tree lengths of the danger tree unless the employer demonstrates that a shorter distance will not create a hazard for an employee." (Exh. O, § 1910.266(h)(1) (vi).)
These standards also provide: "[w]ork areas shall be assigned so that trees cannot fall into an adjacent occupied work area. The distance between adjacent occupied work areas shall be at least two tree lengths of the trees being felled." (Exh. O, § 1910.266(d)(6) (ii).) Also, "[n]o employee shall approach a feller closer than two tree lengths of trees being felled until the feller has acknowledged that it is safe to do so, unless the employer demonstrates that a team of employees is necessary to manually fell a particular tree." (Exh. O, § 1910.266 (h)(1) (iv).)
Fales also presented Mel Harder, an experienced forester, as an expert CT Page 5745 witness. He noted that a logger normally does not carry a second saw with him as he works, and that no industry standard requires a logger to do so. Concerning safety, he stated that when a chainsaw becomes stuck in a tree which is being cut down, prudent behavior dictates that one should not go towards that tree or the area where it is located. In his view, it was the duty of a person in Pierce's position to keep an eye out and make sure that no one approached the tree. The jury reasonably could have credited this testimony as well.
In addition, the jury also could have found that, in his trial testimony, Pierce made a series of admissions which tended to show that his own actions proximately caused his injuries.[2] For example, he stated that, in advance of the tree falling, Fales told him that Fales' saw had become stuck in it. (Tr. of 11/27/01 at p. 21; 11/28/01 at p. 2.) Pierce stated that he asked Fales where the tree was located, so that Pierce could avoid it. (Tr. of 11/28/01 at p. 93-94.) He also admitted that Fales had told him generally where the tree was located. (Tr. of 11/27/01 at p. 22; 11/28/01 at p. 90.) Also, he noted that it is a daily occurrence for saws to become stuck in trees. (Tr. of 11/27/01 at p. 24.) He related that Fales had told him that Fales was going to get another saw in order to cut down the tree. (Tr. of 11/28/01 at p. 91.) Pierce stated that he went into the woods after talking with Fales, in order to continue marking logs on the ground. (Tr. of 11/27/01 at p. 26.) Pierce admitted that from seeing trees on the ground which had been recently cut down, he knew that the tree in which the saw was stuck must be somewhere nearby. (Tr. of 11/27/01 at p. 27; 11/28/01 at p. 101.)
Also, Pierce testified that, for safety, he knew that he was supposed to keep two tree lengths away from a cutting area. (Tr. of 11/28/01 at pp. 68, 90.) He also knew to stay two tree lengths away from any danger tree. (Tr. of 11/28/01 at p. 68.) He acknowledged that a condition involving a stuck (or "pinched") saw is one in which he needed to exercise extra caution. (Tr. of 11/28/01 at p. 88.)
Thus, the jury reasonably could have found that, after being made aware of the presence of a hazardous condition, Pierce negligently came well within the two tree lengths zone of danger and, consequently, that his own negligence was a proximate cause of his injuries. Likewise, it reasonably could have found that Pierce's negligence exceeded any negligence by Fales. It also reasonably could have found that Fales had acted reasonably, and not negligently, under the circumstances, by taking appropriate action to apprise Pierce of the situation and by promptly initiating steps to take down the danger tree.[3]
Here, no interrogatories were requested or submitted to the jury, which rendered a general verdict for Fales. Under these circumstances, it is CT Page 5746 presumed that the jury found every issue in Fales' favor. See Sandow v.Eckstein, 67 Conn. App. 243, 248, 755 A.2d 351 (2001). The evidence amply supported the jury's verdict.
 B. Alcohol
Pierce argues in his memorandum that by allowing the jury to hear evidence related to Pierce's consumption of alcohol, "the court opened the door for confusion and prejudice to enter the jury's deliberations. By allowing the jury to hear this evidence, the court invited them to speculate on the potential effects alcoholism may have had on the plaintiff's actions on the date of this incident and on the events that followed." (See Pierce's memorandum of law, p. 6.) At oral argument, Pierce contended that he had been branded as "an alcoholic without ever using the term." (Tr. of 3/26/02 at p. 3.) Pierce also argues that there was no evidence and no special defense to the effect that Pierce was consuming alcohol on the day of the April, 1998 incident.
"Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue. . . . [E]vidence need not exclude all other possibilities [to be relevant]; it is sufficient if it tends to support the conclusion [for which it is offered], even to a slight degree. . . . [T]he fact that the evidence is susceptible of different explanations or would support various inferences does not affect its admissibility, although it obviously bears upon its weight. So long as the evidence may reasonably be construed in such a manner that it would be relevant, it is admissible." (Internal quotation marks omitted.) Statev. Andresen, 256 Conn. 313, 336-37, 773 A.2d 328 (2001). "It is well settled that questions of relevance are committed to the sound discretion of the trial court." (Internal quotation marks omitted.) State v.Johnson, 67 Conn. App. 299, 306, 784 A.2d 991 (2001), cert. denied,259 Conn. 918, ___ A.2d ___ (2002).
Unless evidence is objected to at trial, a party has not preserved the issue for review by the court. See id., 67 Conn. App. 307-308. This includes objections on the basis that the evidence is so prejudicial that its probative value is outweighed. Id. "In State v. Sinclair, supra,197 Conn. 579, our Supreme Court held: `Our review of evidentiary rulings made by the trial court is limited to the specific legal ground raised in the objection. . . . The reason for this rule is clear: it is to alert the trial court to an error while there is time to correct it . . . and to give the opposing party an opportunity to argue against the objection at trial.'" Remington Investments, Inc. v. National Properties, Inc.,49 Conn. App. 789, 801-802, 716 A.2d 141 (1998).
"The trial court is charged with the responsibility to exclude evidence CT Page 5747 where its prejudicial tendency outweighs its probative value. . . . Evidence is prejudicial when it tends to have some adverse effect upon a [party] beyond tending to prove the fact or issue that justified its admission into evidence." (Internal quotation marks omitted and citations omitted.) State v. Graham, 200 Conn. 9, 12, 509 A.2d 493 (1986).
"[Our Supreme Court] has previously enumerated situations in which the potential prejudicial effect of relevant evidence would counsel its exclusion. Evidence should be excluded as unduly prejudicial: (1) where it may unnecessarily arouse the jury's emotions, hostility or sympathy; (2) where it may create distracting side issues; (3) where the evidence and counterproof will consume an inordinate amount of time; and (4) where one party is unfairly surprised and unprepared to meet it." (Internal quotation marks omitted.) State v. Horrocks, 57 Conn. App. 32, 40,747 A.2d 25, cert. denied, 253 Conn. 908, 753. A.2d 941 (2000).
Here, Pierce's arguments are based on factors (1) and (2). At oral argument, Pierce asserted, "[A]lcohol consumption, unlike other medical conditions, which might be in a person's past, is a hot button in our world today. It is an extremely inflammatory issue, one that carries with it a great deal of prejudicial potential. And in this case, had zero probative value." (Tr. of 3/36/02 at pp. 2-3.)
No case law is cited by Pierce for the proposition that evidence of a history of alcohol consumption presents an issue so prejudicial that it may unnecessarily arouse the jury's emotions, hostility, or sympathy, or create distracting side issues. Our Supreme Court recently has stated, in considering a trial court's ruling in which an objection to questioning about the subject of alcohol consumption was overruled, that since it was within the trial court's discretion to allow the questions and "because there was nothing inherently prejudicial about the defendant's alcohol consumption," the objection was without merit. State v. Raguseo,225 Conn. 114, 136 n. 11, 622 A.2d 519 (1993).
In his general argument that references to Pierce's alcohol consumption should have been excluded, the plaintiff has mentioned by name certain witnesses who were asked questions about Pierce's alcohol usage, and alluded to others. He has not directed the court to specific parts of the trial record, or even to a single citation therefrom. As a result, the court has reviewed the testimony of those witnesses in an attempt to discern the particular portions of the testimony the admission of which forms a basis of the motion.
After review, the court concludes that the number of objections raised by Pierce was limited and that its rulings concerning them were correct. It also finds that much of the evidence of which Pierce apparently now CT Page 5748 complains came in without objection by Pierce.
The issue of alcohol consumption was relevant to Pierce's claimed damages, including whether his history of alcohol usage was a causal factor in creating the deficits which, as described below, Dr. Cook and Dr. Gilstein attributed to the April, 1998 incident. The probative value of such evidence was not outweighed by any prejudice to Pierce.
 1. Medical Records
Evidence of the extent and frequency of Pierce's alcohol use was presented to the jury in medical records which were presented as full exhibits without objection. Various medical records reflected Pierce's regular consumption of alcohol. From these alone, the jury could have found that Pierce stated that he consumed more than one drink of alcohol on an almost daily basis both before and after the April, 1998 incident, over a period of several years. Defendant's Exhibit A is the August 9, 1994 report of Pierce's regular physician, Dr. Kort C. Knudson. At that time, Pierce was "upset about right shoulder pain. The stress causes an upset stomach. He says he may be depressed about the pain. He was using alcohol and pain killers prior to surgery.[4] Now he is not using pain medicines. He has three drinks of alcohol per day. Some days he drinks less." Later in the same report, under "Social History," Dr. Knudson noted "[a]lcohol 3 per day."
Pierce presented Exhibit 11, the records of his consulting neurologist, James H. Cook, M.D. In his July 22, 1998 letter to Dr. Knudson, Dr. Cook reported concerning his initial evaluation of Pierce on that date. At page 2, he notes that Pierce "consumes some alcohol but was rather evasive about how much." As part of Exhibit 10, Pierce submitted the reports of Dr. Knudson. In his August 17, 1998 report, which noted that Pierce was scheduled for neurosurgery with Dr. Poletti later that week, Dr. Knudson stated that Pierce reported that "[h]e drinks two shots of alcohol per day."
 2. Dr. Cook and Dr. Poletti
One of the injuries which Pierce contends was caused by the April, 1998 incident was a subdural hematoma which required surgical removal. Pierce presented the testimony of two treating physicians, Dr. Cook and Dr. Poletti. Dr. Cook, Pierce's neurologist, testified via videotaped deposition. (See Court Exhibit 1, the transcript of his videotaped deposition testimony.) He explained that a subdural hematoma occurs on the inside of the skull and "is bleeding between the covering of the brain, which is a tough membrane lining the skull and the brain itself. What happens with that is that this blow is sustained and it does not CT Page 5749 necessarily become obvious on a CAT scan right away, but due to slow accumulation of blood between this membrane and the brain it can become obvious only later on and in fact, can get quite large." (Court Exh. 1, p. 18.) After determining that Pierce had a subdural hematoma, Dr. Cook referred him to a neurosurgeon in Hartford for surgery in order to remove it, so as to remove pressure on Pierce's brain. Dr. Cook attributed the hematoma to the April, 1998 incident. (Court Exh. 1, p. 30.) In part, he based this conclusion on the fact that Pierce had no bleeding tendencies. (Court Exh. 1, p. 32.)[5]
Pierce also claims as damages various consequences which he attributes to the April, 1998 incident. Dr. Cook testified that he continued to see Pierce after the surgery and that Pierce continued to suffer from the effects of the injury to his head, including tripping over his words when speaking, short-term memory problems, decreased alertness, decreased emotion, fatigue, sensory seizures, and cognitive deficits. (Court Exh. 1, pp. 34-44.) Dr. Cook referred Pierce to Dr. Kenneth Gilstein, a neuropsychologist, for testing and evaluation of his intellectual and cognitive processes. Dr. Cook testified that he relied extensively on Dr. Gilstein's evaluation of Pierce. (Court Exh. 1, p. 47.) Dr. Cook testified that, in his opinion, Pierce had suffered a permanent impairment of 14 per cent of the whole person as a result of the April, 1998 incident. (Court Exh. 1, p. 50.)
On cross-examination, Dr. Cook stated that the information he had about Pierce's preaccident condition "was that he was working full-time in a fairly physically and intellectually demanding job." (Court Exh. 1, p. 58.) He agreed that if that information was not accurate, that "possibly" would have effected his opinion. (Id.)
He also agreed that medical records are an important part of a person's history. (Id.) He saw no pre-April, 1998 medical records concerning Pierce; instead he relied on Pierce's statements concerning his own medical history. (Court Exh. 1, pp. 58-59.) This made it clear that Dr. Cook's opinions were offered without the benefit of seeing Dr. Knudson's report of August, 1994 (Exhibit A), which reported Pierce's alcohol consumption at three drinks a day.
Dr. Cook also stated that he did not know anything about Pierce's consumption of alcohol. (Court Exh. 1, p. 65.) He stated, without objection, that if he had had a history of Pierce indicating that Pierce was essentially an active alcoholic, perhaps that would have altered his opinion. (Id.)
Charles E. Poletti, M.D., a neurosurgeon, also testified via videotaped deposition. (See Court Exhibit 4, a transcript of his videotaped CT Page 5750 deposition.) He is a member of the same practice group as the neurosurgeon to whom Dr. Cook referred Pierce. Dr. Poletti obtained a history from Pierce on August 19, 1998. On August 20, 1998, he surgically removed the subdural hematoma from Pierce's head.
He testified that it was extremely probable that the April, 1998 incident caused the hematoma. (Court Exh. 4, p. 28.)[6] He also stated that either Pierce's counsel had told Dr. Poletti that there was no evidence that Pierce had suffered another significant head trauma or that he received this information from Pierce's counsel through Dr. Poletti's secretary, rather than directly from Pierce's counsel. (Court Exh. 4, pp. 51-53.) He noted that the hematoma (or blood clot) was located directly underneath the area of his head where Pierce had been hit by the tree. (Court Exh. 4, p. 53-54.)
With regard to the effects of alcohol consumption, Dr. Poletti stated, "We ask about alcohol consumption primarily to see if it's going to — because of bleeding. It thins the blood and people that drink a lot, we're more — we're prepared for a higher probability of bleeding during surgery." (Court Exh. 4, p. 65.) He also added, "But he could be a chronic alcoholic with a very high level of alcohol intake up to, say, 12 ounces a day for the last five years and it still wouldn't affect anything that I have said." (Court Exh. 4, p. 68.)
 3. Mr. And Mrs. Pierce
Pierce called his-wife, Linda Pierce, as a witness. On direct examination, she described Pierce's condition after the April, 1998 incident. She also testified that he returned to work at the site where the April, 1998 incident had occurred. In July, 1998, prior to his August, 1998 neurosurgery, he fell and was injured at the site. According to her, from this fall, Pierce sustained bruises, but did not seek medical attention. She stated that she believes "he fell on his rump or the back area." (Tr. of 11/16/01 at p. 15)
In his direct testimony on this topic, Pierce stated that he was standing on a log that was the second or third up in a pile of logs when he fell. (Tr. of 11/28/01 at p. 7.) According to him, while he hit the ground, his head did not; the part of his body which struck the ground was "[t]he crest of my back over — I guess where the back begins and the neck ends and maybe 6 inches or so below that." (Tr. of 11/28/01 at p. 7.) At that time, he was "pretty sure that I was already having some balance and coordination problems and that was getting progressively worse." (Tr. of 11/28/01 at p. 8.)
On direct examination, Mrs. Pierce testified about the pain and CT Page 5751 suffering she observed in her husband, such as the deleterious changes she observed in Pierce's emotional state after the April, 1998 incident, including before and after the August, 1998 neurosurgery. She also discussed various changes she observed in his physical and mental abilities. She described his inability to undertake activities which he previously enjoyed, such as hunting and fishing. Clearly, this testimony related to Pierce's claims for damages.
On cross-examination, she was asked by defense counsel about Pierce's use of alcohol. Without objection, she responded to two questions, stating that Pierce did not drink every day. (Tr. of 11/16/01 at p. 52). Plaintiff's counsel then objected to the following question from Fales' counsel: "I really was trying to refer to the time and period closer to this incident. The pains he was having at the time period of his right shoulder, he was killing the pain with alcohol and medicine, correct?" (Tr. of 11/16/01 at p. 52.) Outside the presence of the jury, Pierce's counsel asserted that the evidence being sought was irrelevant and prejudicial. (Tr. of 11/16/01 at p. 52-53.) In response, Fales' counsel argued that the plaintiff was claiming a change in cognitive functioning, and inquiry ought to be permitted to show that Pierce was regularly mixing alcohol and medication, which also effects cognitive functioning, and which contributed to Pierce's mental state. (Tr. of 11/16/01 at pp. 53-56.) Fales' counsel contended that "if his cognitive abilities are impaired now by alcohol and medicine, then they're not entitled to be compensated for." (Tr. of 11/16/01, at p. 56.)
The court over-ruled the objection. Clearly, the evidence sought to be elicited was relevant, to the issue of damages, such as whether the impairments of which he complains were pre-existing and self-induced to some extent by alcohol consumption.[7] The probative value of this evidence was not outweighed by any prejudicial effect its admission may have had.
Subsequent to the court's ruling on this objection, Mrs. Pierce denied that her husband drank alcohol daily or even four times per week. No further objections were interposed to defense counsel's questioning of Mrs. Pierce on the subject of Pierce's use of alcohol. (See Tr. of 11/16/01 at pp. 57-58.) She conceded that she was not saying that Pierce would never mix alcohol with a medication he was taking. (.See Tr. of 11/16/01 at p. 58.)[8]
When Pierce was cross-examined, his counsel objected again to the subject of Pierce's consumption of alcohol. Again, counsel stated their positions outside the jury's presence. (See Tr. of 11/28/01 at pp. 38-43.) Pierce's counsel argued that its prejudicial nature outweighed its probative value. Defense counsel contended that Pierce's expert, Dr. CT Page 5752 Gilstein, had testified that he seen no evidence that Pierce had been consuming alcohol regularly and that, on cross-examination of Pierce he should be permitted to inquire on this topic.[9]
The court sustained the objection to the general nature of the inquiry as being unlimited in time. (See Tr. of 11/28/01 at p. 43.) Defense counsel then proceeded, without objection by Pierce's counsel, to limit the scope of his inquiry by time. Again, the probative value of the evidence, as it related to the damages claims, was not outweighed by any prejudicial effect.
In response to his questions about whether Pierce was a daily drinker of alcohol from 1994 forward, Pierce denied it. (See Tr. of 11/28/01 at p. 44.) When confronted with Dr. Knudson's August 9, 1994 report (Exhibit A), which, as noted above, was admitted without objection, and in which Dr. Knudson recorded Pierce's statement that he had three drinks of alcohol per day, Pierce stated that if he told Dr. Knudson that, then it was true, but "that perhaps might have been a period of less than a month or something." (Tr. of 11/28/01 at p. 45.) Then, he corrected that to two or three beers, not two or three drinks. (Id.) He also agreed that, in August, 1998, four months after the April, 1998 incident, he told Dr. Knudson that he was drinking two shots of alcohol a day. (Id.)
When asked about the period August, 1994 to August, 1998, Pierce responded as follows: "The answer would be yes and no. And not to be evasive, during the summer months are warmer months. If someone posed the question, Did you drink beer on a daily basis, I would say five days out of seven. Hard liquor, no. But, then perhaps around Thanksgiving, Christmas, and New Years, it would be hard liquor and not beer." (Tr. of 11/27/01 at p. 46.) He stated that he did not drink beer at the job site where the April, 1998 incident occurred until, he guessed, two months after it happened. (Id.)
 4. Jason Kinney and Benjamin Hall
Although not mentioned by name, the court has also reviewed the testimony of Jason Kinney, a defense witness, since, at oral argument, Pierce argued that the court erred in allowing questioning of other workers concerning Pierce's alcohol consumption at the site. (See transcript of oral argument, March 26, 2002, p. 4.) Mr. Kinney worked at the site and saw Pierce fall off the pile of logs in July, 1998. (See Tr. of 11/28/01 at pp. 122-123.) He testified that Pierce fell backwards, behind the log pile. (Tr. of 11/28/01 at p. 126.) He described it as a five or six foot drop. (Id.)[10] Kinney did not see him land or hit his head on the ground. When he went over to Pierce, Pierce was lying on his back. (Tr. of 11/28/01, p. 127-128.) He observed "a couple little scrapes CT Page 5753 on the back of his head. But, like, it immediately dried. It wasn't like running blood." (Tr. of 11/28/01 at p. 127.) He also had blood coming through his shirt on his shoulder, and a scrape on his elbow. (Id.) As to the head, he further stated that Pierce had "[a] lot of little red spots, like, where his head might just, you know, when it hit the ground, it cut — a couple pebbles maybe in the soil or whatever might have just cut him a tiny bit." (Tr. of 11/28/01 at p. 128.) Kinney added, "[h]e landed on his upper shoulders and possibly his head could have landed first too. I'm not sure." (Id.)
No objection was put forth concerning the above-described portion of Kinney's testimony. When Fales' counsel asked whether, during the period June-August, 1998, Pierce brought alcoholic beverages to the site, Pierce's counsel objected, claiming that the probative value of such evidence was outweighed by its prejudicial effect. (Tr. of 11/28/01 at pp. 129-132.) In response, Fales' counsel made a proffer on the following bases: (1) the evidence impeached Mrs. Pierce's credibility, because it showed that, in contrast to what she said, Pierce regularly consumed alcohol; (2) it provided evidence to show that Dr. Gilstein's opinions, which excluded alcohol as a factor in causing his impairments, were not well-founded;[11] and (3) it showed that, since alcohol consumption thins the blood and increases bleeding,[12] it was more likely that the July, 1998 fall, and not the April, 1998 incident, caused the subdural hematoma, since the former incident was closer in time to the discovery of the hematoma than the latter. Id. Clearly, points (2) and (3) related to the question of damages. Pierce's counsel responded, in part, by saying that there was no evidence of head trauma in the July, 1998 incident. The court is unpersuaded by this comment; while Kinney did not say that he saw Pierce fall on his head, the evidence would have permitted the jury to find, by inference, that the bruises which Kinney observed on Pierce's head immediately after he fell were so caused.
The court concluded that the proposed evidence was probative, especially concerning the damages claims, and that it was not outweighed by prejudicial effect, and overruled the objection. Upon review, the court concludes that this ruling was correct.
Kinney stated that, at the end of the work day, all of those working had a few beers after work. (Tr. of 11/28/01 at p. 132.) "[I]t was pretty common to see Jeff (Pierce) have a beer in his hand and a tape measure in the other hand." (Tr. of 11/28/01 at p. 133.) Pierce brought a cooler to the site which contained beer. While the rest of the workers, who, unlike Pierce, were using heavy equipment or a chainsaw, did not drink beer until the work day was done, that was not true for Pierce. (Id.) Kinney also stated that on the day Pierce fell, Kinney did not observe Pierce drinking alcohol on the job. (Tr. of 11/28/01 at p. 139.) CT Page 5754
Fales also called Benjamin Hall as a witness. He, too, was working on the site on the July, 1998 day when Pierce fell at the site. Without objection, Hall testified that Pierce had one beer at the site afterwards on that day. (Tr. of 11/28/01 at p. 143.)
At oral argument on the motion, Pierce also asserted that the court had erred by permitting questioning of Pierce about the presence of a cooler in a surveillance videotape of Pierce's activities, presented by Fales. Pierce's counsel sought to distinguish such questioning from that contained related to the evidence contained in Pierce's medical records. He stated, "Then to say to equate that to opening the door to this repeated questioning regarding pre incident alcohol consumption, post incident alcohol consumption. questioning Mr. Pierce regarding the videotape and what was in the cooler and laying the clear inference — more than just an inference — the accusation that it was a cooler filled with beer, the same blue cooler that the testimony had been put in by the two witnesses who weren't even witnesses to the event that Mr. Pierce was supposedly bringing to the job site months later. I don't think that that opens the door to that avenue of questioning." (Tr. of 3/26/02 at pp. 5-6.)
Review of the record reveals that no objection was interposed at trial by Pierce to this line of inquiry. The record shows that the videotape was offered by Fales and that Pierce was called to testify about it during the presentation of Fales' case.[13] After confirming that the videotape depicted himself, Pierce was asked, without objection, if a blue and white cooler shown on the tape was his. He stated that it was. (Tr. of 11/30/01 at p. 4.) Then, also without objection, he was asked if it was the same cooler referred to by Kinney. He responded, "I don't know if it's the same cooler. What's the difference?" (Id.) Subsequently, Pierce's counsel stated that he had no objection to Fales' offer of the videotape in evidence. (Tr. of 11/30/01 at pp. 6-7.)
The above reflects the limited questioning of Pierce about the cooler shown on the videotape. Contrary to Pierce's counsel's assertions at oral argument, since no objection was made by Pierce to these questions at trial, the court made no ruling about them. Thus, any "inference" or "accusation" was not objected to at the time.
 5. Dr. Gilstein
Dr. Kenneth Gilstein, a psychologist, was also called as a witness by Pierce. As noted, Dr. Cook referred Pierce to Dr. Gilstein for neuropsychological testing. Dr. Gilstein testified that neuropsychology is the study of the brain and its effect on behavior and functioning. In CT Page 5755 essence, he was a witness concerning the extent of damages Pierce claims to have suffered as a result of the April, 1998 incident.
In the course of his work, Dr. Gilstein obtained a history from Pierce and one from his wife, and reviewed certain medical records, as well as Pierce's high school transcript. The medical records included those of Dr. Knudson, Pierce's primary care physician. (Tr. of 11/20/01 at p. 22.) On two separate days, April 7, 1999, and May 5, 1999, he gave Pierce a series of standardized psychological tests. (Tr. of 11/20/01 at pp. 35-36.)
Included in the testing were measures of whether Pierce was malingering when he underwent the testing. (Tr. of 11/20/01, pp. 54, 57-58.) Dr. Gilstein concluded that Pierce was making a good effort. In Dr. Gilstein's opinion, Pierce had suffered a mild to moderate traumatic brain injury, (Tr. of 11/20/01 at p. 59, 76), with consequential memory deficits, deficits in concentration, impairments in learning ability, executive functioning, and manual dexterity. (Tr. of 11/20/01 at pp. 60-69, 75-77.) He also agreed that changes in temperament, such as being quicker to anger, and fatigue were consistent with such a condition. (Tr. of 11/20/01 at p. 79-80.) Dr. Gilstein also stated that these consequences were permanent for Pierce. (Tr. of 11/20/01 at 81.)
He found that Pierce was depressed as a result of his brain injury. (Tr. of 11/20/01 at p. 34.) Dr. Gilstein also performed personality tests and concluded that, although Pierce was depressed, that had not caused the cognitive impairments he had found. (Tr. of 11/20/01 at p. 71.)
On direct examination, Dr. Gilstein stated that he did not observe anything about Pierce that might indicate an impairment of his abilities that would come from any outside influences, such as medications or alcohol or anything of that nature. (Tr. of 11/20/01 at p. 69.)[14] That was something Dr. Gilstein stated he would be looking for, as he was doing the testing, "[a]ll the time." (Id.) He added, "[i]f a person comes in and they're under the influence of either drugs or alcohol, or heavy duty medication, you're not going to get a true read of what's happening with their brain functioning." (Tr. of 11/20/01 at p. 70.)
On cross-examination, Dr. Gilstein acknowledged reviewing Dr. Knudson's report of August, 1994 (Exhibit A), but could not recall whether he read it before he prepared his report about Pierce or afterwards. (Tr. of 11/20/01 at p. 136.) He acknowledged that the history Pierce gave to Dr. Gilstein left out a lot of the details of the history recorded by Dr. Knudson. (Tr. of 11/20/01 at pp. 136-137.) He stated that, if he had known of that, "[t]hat would be a big red flag to me, yes." (Tr. of 11/20/01 at p. 137.) For example, Dr. Gilstein stated that he did not know CT Page 5756 there was a prior history of depression. (Tr. of 11/20/01 at p. 140.) Nevertheless, that information did not alter any of his conclusions. (Tr. of 11/20/01 at p. 140.)
No objections were raised by Pierce's counsel to questions on cross-examination of this witness which related to alcohol consumption. Without objection, Dr. Gilstein was asked on cross-examination about his conclusion that Pierce did not appear to be under the influence of alcohol when he underwent the testing. (Tr. of 11/20/01 at pp. 143-145.) Dr. Gilstein stated that he did not ask Pierce about his drug or alcohol use. Pierce reported no drug or alcohol problems to Dr. Gilstein. (Tr. of 11/20/01 at p. 144.) However, Dr. Gilstein acknowledged that he had medical records which reflected that Pierce was evasive about alcohol use. (Id.)[15] Dr. Gilstein stated that he used the testing to find out if drinking was impairing Pierce. (Tr. of 11/20/01 at p. 145.)
He noted that Dr. Cook had prescribed Dilantin, a seizure medication, for Pierce. Tr. of 11/20/01 at p. 146.) Dr. Gilstein agreed that mixing medications with alcohol could have an effect on cognitive affect. He responded, "[d]o they have a greater effect if they're mixed with alcohol? I would assume that if someone — again, I don't know the specific drug interactions. If you're on Dilantin, I would imagine it's not a good idea to take Dilantin and drink." (Tr. of 11/20/01 at 147.)
As noted, Pierce did not cite to any particular part of the record to support his assertions in support of his motion. However, at oral argument on the motion, Pierce referred to questioning of Dr. Gilstein as forming part of the testimony which the court purportedly admitted over Pierce's objections. Pierce's counsel stated, "And again, nobody ever testified as to the probative value of alcohol consumption in any way, shape or form, and it was only over repeated objectioning that Dr. Gilstein was questioned about this at length. And Your Honor made it quite clear in your rulings that you were going to permit this line of questioning." (Tr. of 3/26/02 at p. 6.)
The subject of alcohol consumption made up only a part of the cross-examination of Dr. Gilstein. Contrary to Pierce's counsel's assertions, there was no "repeated objectioning" during Fales' counsel's questioning of Dr. Gilstein on this subject. As reflected above, the court's review of the transcript of Dr. Gilstein's testimony reflects not a single objection by Pierce's counsel to questions posed to the witness related to alcohol consumption. The court cannot review rulings it did not make in response to objections which did not occur.
 6. Dr. Sass CT Page 5757
Dr. Kimberlee J. Sass, a psychologist, was called as a witness by Fales.[16] Like Dr. Gilstein, he has extensive experience as a neuropsychologist. Similarly also to Dr. Gilstein, many of the patients he has seen have abused drugs or alcohol. (Tr. of 11/29/01 at p. 152.) From 1984 to 1998, Dr. Sass was the director of neuropsychology services in neurosurgery at Yale University and Yale-New Haven Hospital in New Haven, Connecticut.
At oral argument on the motion, Pierce asserted, "during the defendant's case, there was repeated questioning of Dr. Sass regarding alcohol consumption without ever any testimony by Dr. Sass that alcohol consumption, A; either affected Mr. Pierce's conduct on the date of the incident, affected his performance on the testing, or was responsible for any of his symptomology, which he was claiming." (Tr. of 3/26/02 at p. 3.) Review of the record demonstrates that no objections were made by Pierce's counsel during significant portions of Dr. Sass' testimony, including on subjects of which Pierce now complains.
For example, on direct examination, without objection, Dr. Sass summarized Pierce's history, based on Dr. Sass' review of Pierce's records. Pierce's history showed that, before the July, 1998 incident, he had been experiencing chronic pain for many years and was treated "fairly aggressively with medications that are known to have side effects on mental functions. And there's a history of alcohol use that's vaguely detailed in the records, but it suggests drinking, perhaps on a daily basis for some number of years." (Tr. of 11/29/01, at pp. 27-28.)
Dr. Sass reviewed the results of the tests which were administered to Pierce by Dr. Gilstein. Without objection, Fales counsel noted that Dr. Gilstein had said he did not see any effects of alcohol on Pierce when he administered the tests to Pierce. He then asked whether it would matter "if somebody was daily drinking heavily and stopped, would that affect cognitive abilities?" (Tr. of 11/29/01 at p. 17.) There was no objection to this question. Dr. Sass responded:
"Well, if someone had been drinking consistently, daily, for a long period of time, whether or not they had just stopped it would make a difference. Alcohol's known to be toxic to the brain and to cause certain impairments in people's mental functions. Visual processing and processing speed are perhaps the two most sensitive indices of long term alcohol use." (Id.) Also without objection, he noted that persons who have a chemical dependency and who stop their intake undergo withdrawal and become physically uncomfortable, which tends to be "internally distracting." (Id.) In such circumstances, "any effort they spend thinking about their physical discomforts, is effort that isn't being [given] to the testing." (Tr. of 11/29/01 at p. 18.) CT Page 5758
Also without objection, Dr. Sass noted that Dr. Gilstein had not addressed Pierce's alcohol use in his report. (Id.) Further, when asked, since Dr. Cook had noted that Pierce was evasive about his alcohol use, whether, under standard practice, there should have been some inquiry by Dr. Gilstein about that, again no objection was interposed. (Id.) Dr. Sass responded: "given the reports in his medical records about his alcohol consumption, and about the difficulty other people had had in determining precisely what the amount and duration of his alcohol use had been, I think exploration of that was reasonable. And having looked at Dr. Gilstein's handwritten interview notes and all of the forms that were filled out, I don't find any evidence that that was even attempted." (Id.)
Also without objection, Dr. Sass testified that the use of alcohol is one risk factor for the development of subdural hematomas. Since alcohol is an anti-coagulant, "people who regularly use alcohol are at a higher risk of incurring a subdural hematoma." (Tr. of 11/29/01 at p. 83.)
As to the development of Pierce's subdural hematoma, Dr. Sass also testified, without objection, that its timing suggests that it arose from the second accident, Pierce's fall at the site in July, 1998, not from the April, 1998 incident. (Tr. of 11/29/01, pp. 37-40.)
Without objection, he testified that alcohol use can affect cognitive functioning. Also, he stated that "alcohol often accentuates the effects of medications that are sedating; pain medication, analgesics, medications that are designed to reduce anxiety, are medications whose effects are increased by the simultaneous use of alcohol." (Tr. of 11/29/01 at p. 84.)
Dr. Sass then summarized, without objection, the medications prescribed for Pierce and the effects when combined with alcohol. "Mr. Pierce's records show that he was prescribed Roxicet, which is a synthetic morphine — it's a synthetic narcotic that has the same properties as morphine. [It] causes anesthesia and sedation, and it's among the medications whose effects are enhanced by the simultaneous use of alcohol. That's also true for Phenobarbital, an anti-seizure medication, which is also sedating on its own, but particularly so, when it's combined with the use of alcohol. He also was on Dilantin for a period of time. Alcohol is important when people are using Dilantin, because it reduces the effectiveness of Dilantin in controlling seizure." (Tr. of 11/29/01 at p. 85.)
Concerning symptomology, Dr. Sass was asked, again without objection, to describe what may be anticipated from the use of alcohol with these CT Page 5759 medications. His response, which the jury could have found related directly to the opinions expressed by Dr. Gilstein, and therefore to Pierce's damages claims, was as follows:
"The most important thing is that the individual will feel tired. The medications themselves are sedating. And by sedating, I mean, they'll cause the sense of fatigue, need to sleep, individual will move and think and act more slowly, and they'll have difficulty maintaining attention and concentration throughout the day. When someone is using the kinds of medications that Mr. Pierce had, and is also consuming alcohol at the same time, it might be expected that he would feel fatigue with efforts more quickly during the day, need to nap, would complain of problems maintaining attention and concentration. And because of those, also complain of memory difficulties, because what we don't attend to, we don't remember. Other common effects of those medications when they're used with alcohol are slurred speech, word finding difficulty, and [gait] difficulties." (Tr. of 11/29/01 at pp. 85-86.)
On cross-examination, Dr. Sass stated that he had no information to indicate that Pierce had consumed alcohol just before Dr. Gilstein's testing or that he was under the effects of alcohol during the testing. (Tr. of 11/29/01 at pp. 91-92, 151.) In addition, he stated that Dr. Gilstein's records did not show what medications Pierce was taking on the dates of the testing. (Tr. of 11/29/01 at p. 93.) In contrast, he did know what medications Pierce was prescribed at about that time. (Tr. of 11/29/01 at pp. 93-94.) On further examination, he agreed that Dr. Gilstein's records showed what Pierce had been prescribed and that Pierce could not remember what medications he was taking. (Tr. of 11/29/01 at pp. 94-95.)
Also on cross-examination, Dr. Sass stated that the drinking of alcohol can make a person more prone to a subdural hematoma. (Tr. of 11/29/01 at p. 136.) He agreed that he had not done any study or research on how much alcohol it takes to have an anti-coagulative effect on the blood. (Tr. Of 11/29/01 at pp. 136-137.)
At oral argument on the motion, Pierce also asserted that the court erred in connection with Dr. Sass' testimony by permitting him to discuss certain articles which had been published in journals. (See Tr. of 3/26/02 at p. 4.) In particular, Pierce complains that, while these articles show that alcoholics are more prone to brain injuries or brain hemorrhaging than others, there was no evidence that Pierce is an alcoholic. Again, Pierce makes no reference to specific exhibits. After review of the testimony, the court has not found an objection to any of these articles on the grounds of prejudice.[17] Again, the court cannot review rulings which it did not make in response to objections which were CT Page 5760 not raised.
In summary, after review, the court finds that its rulings concerning Pierce's objections to testimony related to his alcohol consumption were correct. The evidence shows that his alcohol use was relevant to his damages claims, on which Pierce bore the burden of proof. This relevance is not dependent on whether or not Pierce was diagnosed as an alcholic. While it was not Fales' burden to disprove Pierce's damages, he was entitled to cross-examine and to present evidence related to those claims. No special defense relating to damages was required. As noted, the court's review shows that much of the evidence came in without objection by Pierce or was presented by Pierce himself. Pierce has not shown that the probative value of the evidence to which he did object was outweighed by prejudice or that the jury was confused by such evidence.[18]
 C. Presentation of Pleadings To The Jury
In his memorandum of law, at page 2, Pierce also contends that the court erred by not providing the complaint and answer to the jury for its consideration. In response, at oral argument, besides disagreeing with this contention, Fales asserted that it is untimely raised, since it was not presented by Pierce within ten days of the acceptance of the verdict.
Practice Book § 16-35 provides that a motion to set aside a verdict must be filed within ten days after the day the verdict is accepted. Here, the verdict was accepted on December 5, 2001; Pierce did not raise the issue of the court's not providing the pleadings to the jury until it was set forth in his memorandum, which was filed on January 17, 2002. Our Appellate Court has held that raising an issue in a post-motion memorandum on a motion to set aside is sufficient. See Poisson v. Quality ElectricalContractors, Inc., 29 Conn. App. 151, 155, 612 A.2d 1232 (1992). Accordingly, the court considers the issue.
In his memorandum, at page 2, Pierce notes that Practice Book §16-15 vests the court with the discretion as to whether to submit the pleadings to the jury. He acknowledges that the court read portions of these pleadings to the jury during its instructions to the jury. See id. Pierce alleges that the jury was concerned about the contents of the pleadings, as evidenced "by the questions posed during deliberations where they asked the court to re-read both the plaintiff's and the defendant's specifications of negligence." Id. He claims that this is evidence of "obvious confusion" as to the allegations. Therefore, he alleges, "the better practice would be to permit the jurors the opportunity to have the claims in front of them while conducting their deliberations." Id. No CT Page 5761 authority is cited to the court for this proposition.
Pierce's counsel does not cite to the record to show that a request was made on the record at any time for the pleadings to go into the jury room.[19] The time to raise this ground on the record was either before the court gave its instructions, in the form of an objection after the charging conference, or afterwards, in the form of an exception to the court's instructions. The only exception raised by Pierce after the court instructed the jury was to the court's instructions on contributory negligence and comparative negligence. The court then adopted counsel's suggestions for clarification and directed the jury to be brought out again to hear the court's clarification. (Tr. of 12/05/01 at pp. 1-9.)
As to the jury's requests, the record shows that there were two. Court Exhibit 8 is the first: "Can we/do we get a copy of the judges instructions to the jury? IE. Instructions regarding what constitutes negligence." In response to this note, the court met with both counsel in chambers to review the jury's note, to receive suggestions from counsel as to a response, and to formulate a response. The record reflects that the court had discussed the note in chambers with counsel and that the response was that the court's instructions were not prepared in a form for distribution. The record reflects both that the court then so informed the jury and that there were no exceptions taken to this response. (Tr. of 12/05/01 at pp. 11-12.)
Then the court received a second note from the jury, which reads: "(1) Please read back to us the specific negligence claims regarding the plaintiff's allegations ie (a-e) to include all points. (2) Also please read back the defendants special defenses regarding negligence ie (a-f) to include all points." (Court Exh. 9.) The record shows that counsel discussed this note in chambers with counsel as well. The court noted that it intended to read certain portions of the instructions to the jury again, in response to the note. Pierce's counsel then asked whether the court intended to read both specifications of negligence claimed by the plaintiff (standard negligence and negligence based on premises liability). The court responded that it intended to read both, to which Pierce's counsel replied, "Okay." An exception was raised by Fales' counsel (renewing a previous exception), claiming that reading both overemphasized the plaintiff's claims. The court then proceeded to reread to the jury both grounds of negligence set forth by Pierce, as well as Fales' special defenses. Pierce took no exception to this reading. (Tr. of 12/05/01 at pp. 13-18.)[20]
There were no further questions from the jury. The record reflects that a little over two hours later the jury had reached its verdict. (Tr. of 12/05/01 at p. 18.) CT Page 5762
"To preserve a challenge to the jury charge, the defendant must make a written request to charge, or take exception to the jury instructions when they are given by the trial court." Murray v. Taylor,65 Conn. App. 300, 328, 782 A.2d 702, cert. denied, 258 Conn. 928,783 A.2d 1029 (2001). Here, as noted, Pierce took no exceptions to the court's instructions on the ground now raised. To the contrary, in his written request to charge, dated November 16, 2001, he specifically requested the court to read to the jury the two alternate grounds of negligence liability which he claimed. (See plaintiff's request to charge, pp. 11, 14.) Under the circumstances, the court must deem any challenge to the court's proceeding by reading the plaintiff's specifications of negligence, and the special defenses, and by not sending the pleadings into the jury deliberation room, to have been waived.
Notwithstanding this finding, the court also concludes that its exercise of its discretion in this regard was correct. As to the question of liability, this is a straightforward personal injury case. The court instructed the jury on the parties' respective claims as to negligence and the related legal principles. In this case, the parties presented a number of documentary exhibits, including medical records, for the jury to review. There was no reason to burden their deliberations with unnecessary, additional materials to pour through.
In addition, the court finds that the two notes presented by the jury do not reflect in any way that the jury was confused. In an analogous situation, our Supreme Court stated, "[t]he mere fact that a jury requests reinstruction is not unusual, especially in a situation such as this, where the charge includes a number of separate and differing degrees of crimes to be considered. We believe that, if anything, these requests demonstrate the jury's conscientiousness and not their confusion." State v. Cannon, 185 Conn. 260, 271-272, 440 A.2d 927
(1981). See also Taylor v. Winsted Memorial Hospital, Superior Court, judicial district of Litchfield at Litchfield, Docket No. 071167 (May 16, 2001, Matasavage, J.).
Pierce has not shown that prejudice or confusion infected the verdict. The jury's finding in favor of Fales is supported by and is not against the evidence which was presented at trial. There was an ample evidentiary basis for the jury's verdict. Likewise, the verdict was not contrary to law.
 CONCLUSION
Accordingly, the motion to set aside the verdict and for a new trial is denied. Judgment may enter on the verdict in favor of the defendant. It CT Page 5763 is so ordered.
BY THE COURT
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT